**In re MCORP FINANCIAL, INC., MCorp Management, and MCorp, Debtors.**

**Bankruptcy Nos. 89–02312–H3–11, 89–02324–H5–11, 89–02848–H2–11 and 89–02312–H3–11.**

United States Bankruptcy Court,
S.D. Texas,
Houston Division.

Jan. 7, 1992.

See also 122 B.R. 49, 137 B.R. 237.

D.J. Baker, Melanie Grey, Wendy K. Laubach, Weil, Gotshal & Manges, Houston, Tex., for debtors.

Philip Anker, Shearson Lehman Hutton, Inc., William J. Perlstein and Elizabeth S. Duane, Wilmer, Cutler & Pickering, Washington, D.C., Donald Christie, Kirkendall & Collins, Houston, Tex., Robert Rosenberg, Latham & Watkins, New York City, for Creditors Committee.

John Flowers, Law Offices of John Flowers, Dallas, Tex., for Principal Mut. Life Ins. Co.

Jeff W. Hurt, Brooke E. Smith, Leonard, Marsh, Hurt, Terry, & Blinn, P.C., Houston, Tex., for F.D.I.C.

MEMORANDUM OPINION

LETITIA Z. CLARK, Bankruptcy Judge.

Three plan(s) contained in one document, the Revised Third Proposed Chapter 11 Plan of MCorp, MCorp Financial, Inc., and MCorp Management, Debtors and Debtors–in–Possession in the above-captioned Chapter 11 cases (referred to as "Debtors"), have been the subject of a contested confirmation hearing. The court has considered the plan(s), objections, pleadings, evidence, memoranda and arguments of counsel, and makes the following Findings of Fact and Conclusions of Law and enters a separate Judgment. To the extent that any findings of fact are deemed to be conclusions of law, they are hereby adopted as such. To the extent that any conclusions of law are deemed to be findings of fact, they are hereby adopted as such.

Debtors have chosen to present for confirmation plan(s) which skate a line drawn deliberately thin through various "tests" incorporated in the Bankruptcy Code. In the event, their progress along this self-chosen and perilous line has been marred by broken edges and failed burdens of proof. Confirmation is denied.

*Jurisdiction*

1. Pursuant to 28 U.S.C. §§ 1334 and 157 and the standing Order of Reference of the United States District Court for the Southern District of Texas dated August 9, 1984, the court has jurisdiction to consider the Debtors' request to confirm the Plans. Venue is proper and this is a core proceeding under 28 U.S.C. § 157(b)(2)(L).

*Procedural History and Background*

2. On March 21, 1989, three creditors of MCorp commenced an involuntary case against MCorp under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.

3. On March 31, 1989, two of MCorp's subsidiaries, MCorp Financial and MCorp Management filed with this court voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Later that day, upon application of MCorp, the New York Bankruptcy Court ordered the Involuntary Case converted to a case under Chapter 11 of the Bankruptcy Code and entered an order for relief under Chapter 11 upon consent of MCorp.

4. Pursuant to an Order dated April 4, 1989, the New York Bankruptcy Court granted MCorp's motion to transfer its Chapter 11 case to the Southern District of Texas. Pursuant to Orders dated March 31, 1989 and April 20, 1989, the Chapter 11 cases of MCorp, MCorp Financial, and MCorp Management were jointly administered in accordance with B.R. 1015.

5. MCorp Financial is the holding company for MCorp Management, the five remaining MBanks, and substantially all of the other non-debtor subsidiaries in the group. MCorp Management provides management and technical services for the remaining MBanks and other subsidiaries. As of December 31, 1988, MCorp and its banking subsidiaries (the MBanks) had consolidated assets in excess of approximately $17 billion. The closure of twenty MBanks formerly owned by the Debtors in March 1989 left the Debtors with five remaining MBanks with deposits totalling in excess of $2.3 billion and approximately $70.4 million in shareholders' equity as of December 31, 1989. Combined timely filed claims totalled over two billion.

6. MCorp is a publicly owned corporation that, as of June 30, 1990, had outstanding 42,573,397 shares of common stock held by approximately 16,271 stockholders, and 959,670 shares of $3.50 cumulative convertible preferred stock held by approximately 554 stockholders, both of which were listed and traded on the Pacific Stock Exchange, and two series of closely-held money market cumulative preferred stock with an aggregate liquidation preference of $125 million. In addition, MCorp has outstanding approximately $470 million in principal amount of senior as well as subordinated, privately placed and publicly held debt. MCorp and MCorp Financial are jointly and severally liable for the payment of virtually all this indebtedness.

7. Pursuant to §§ 1107(a) and 1108 of the Code, the Debtors are continuing to operate their businesses and manage their properties as Debtors–in–Possession.

8. On May 5, 1987 the United States Trustee appointed a single Creditors' Committee to represent the creditors in all of the Debtors' cases. (See Docket No. 57.)

9. Since the commencement of this case the Debtors obtained seven extensions of time within which to exclusively file a plan and make solicitation. (See Motions for Order Granting Extension of Exclusivity Period..., Docket Nos. 185, 495, 633, 770, 965, 1189, & 1513.)

10. Debtors were faced with a variety of problems in developing workable plans suitable to all creditors. The Debtors stated they have been involved in extensive negotiations with a majority of the creditors since the initial filing of these petitions, and that they have worked diligently in attempting to formulate what they thought would be consensual plans. However, as it turned out, the plans were not consensual, and the Debtors faced a substantial burden of proof. The court finds Debtors have failed to meet their burden of proof in establishing that the plans comply with § 1129(a) setting forth the requirements necessary for confirmation of any plan, and § 1129(b) setting forth the requirements necessary for confirmation over the objection of an impaired class, that is, the "cramdown" provision.

11. The Debtors filed their original Proposed Disclosure Statement and Plan on March 11, 1991, with a Second Proposed Disclosure Statement and Plan filed on June 7, 1991 and a Third Proposed Disclosure Statement and Plan filed on September 11, 1991. (See Docket Nos. 1088, 1089, 1249, 1250, 1550, 1551.) The Third Proposed Disclosure Statement and Plan filed on September 11, 1991, was revised on September 30, 1991 and these were the plan(s) presented for confirmation. (See Docket Nos. 1616, 1652.) These plan(s) required,

*inter alia,* that the claims against Debtors, in excess of $2 billion, be reduced to $120 million by December 31, 1991, thus imposing severe time constraints on the contested claimants, on proponents and opponents of the plan, and on the various Federal District Courts, including the Northern District of Oklahoma (addressing claim of Flynn Energy) and Southern District of Texas (addressing claims of Electronic Data Systems Corporation, Commercial Real Estate Associates, Inc., & FDIC), as well as the Bankruptcy Court, called upon to address the contested claims.

12. Debtors filed one single document referred to as the "Chapter 11 Plan of MCorp, MCorp Financial, Inc., and MCorp Management." Debtors have interchangeably referred to the document as the plan (singular) and plans (plural) of these Debtors. Although these Debtors are jointly administered, they are not substantively consolidated.

13. An Order was entered approving the Revised Third Proposed Disclosure Statement on October 1, 1991. (See Docket Nos. 1642, 1623.) Thereafter, on October 11, 1991, a Pretrial Order setting forth pretrial and trial procedures in connection with the confirmation hearing was entered. (See Docket No. 1675.)

14. The Chapter 11 plan for MCorp Management is a liquidating plan that provides for distribution of the assets of MCorp Management to its creditors and equity security holders in the order of their relative priority under the Code. The mechanics consist of a relatively straightforward liquidation. However, due to the fact that the primary claims against MCorp Management are held by MCorp and MCorp Financial, the principal effect of the MCorp Management Plan will be to increase the assets available to fund the plans of MCorp and MCorp Financial. See Trial Testimony of Peter Bartholow, 11/13/91, p. 55–56, 59–60.

15. MCorp and MCorp Financial are jointly and severally liable for substantial claims. Many of the unsecured claims against both Debtors (the "Junior Claims") are subordinated to other unsecured claims (the "Senior Claims"). Claims against both MCorp and MCorp Financial will receive distributions from the assets of both. Trial Testimony of Bartholow, 11/13/91.

16. The plan provides for an initial cash distribution 30 days after confirmation in addition to establishment, at that time, of the contested claims reserve. Thereafter, interim distributions are to occur quarterly upon liquidation of non-cash assets and as contested claims are resolved. The interim distribution is to be implemented through the creation of three liquidating trusts. Additionally, the proceeds of any recovery from pending litigation with the FDIC in excess of certain thresholds is to be distributed to junior creditors. The plan further provides that MCorp and MCorp Financial will transfer legal title to their causes of action to the Litigation Trust, for which a single litigation trustee will be named by the Trust Board. The Litigation Trustee will pursue the causes of action of MCorp and MCorp Financial under the direction of the Trust Board. The plan provides for the establishment of three Litigation Reserves to finance the Debtors' expenses of litigating various contested claims and affirmative recovery actions against third parties, including the FDIC. All existing shares of preferred and common stock of MCorp and MCorp Financial will be canceled and these two corporations will be dissolved under applicable state corporate law. See Revised Third Proposed Plan, Docket No. 1652. Trial Testimony of Bartholow, 11/13/91, pp. 60, 62–65, 67–74.

*Objections and Rejections*

17. Several objections to confirmation of the Debtors' plan were filed, including objections filed by Karl T. Butz, Jr., Principal Mutual Life Insurance Company ("Principal Mutual"), FDIC, Shearson Lehman Hutton, Inc. ("Shearson"), and Mr. & Mrs. Andrews, individual pro se shareholders. In addition, two limited objections were filed: one by the CCNB Lenders and the other by the One Alamo Center Lenders. The Creditors' Committee, Mercantile–Safe Deposit & Trust Company and Fidelity Management & Research Co. all filed re-

sponses in support of confirmation of the Debtors' plan. (See Docket Nos. 1861, 1864, 1865, 1866, 1873, 1874, 1886, 1936, 1942, 1957.)

18. The FDIC objected to the plan in an original objection and a supplement, on the basis that the plan: (1) violates the "best interests of creditors'" test; (2) improperly implements § 502(c) of the Code; (3) improperly allows creditors with claims against two or more Debtors to receive recoveries from more than one estate; (4) improperly leaves the task of investigating preferences in the hands of insiders; (5) unfairly discriminates against the claims of certain unsecured creditors, including the FDIC; (6) improperly classifies the FDIC with other unsecured creditors, including insiders; (7) fails to equitably subordinate the claims of insiders; (8) violates § 1129(a)(10) since not one impaired class has accepted the plan (exclusive of the voting of insiders); (9) violates § 1126(c) as Debtors fail to meet the standards for acceptance of the plan; and (10) violates § 1129(a)(8) since not all classes have accepted the plan.

19. Principal Mutual objected to the plan on grounds that the plan: (1) improperly implements § 502(c) as they provide for the estimation of contested claims regardless of the applicability of § 502 to contested claims; (2) provides for estimation of contested claims for the purpose of establishing a cap on the amount of such claims for purposes of distributions, and allow the Debtors to attempt to reduce the allowed amount of such claims below the estimation cap; (3) allows for possible disparate treatment of contested claims which are included in class 13 in violation of § 1123(a)(4)'s calling for equal treatment of all claims contained within one class; (4) violates the best interests of the creditors' test; and (5) improperly grants the Debtors a discharge to which they are not entitled under §§ 1141(d)(3) and 727(a).

20. An additional objection raised by Principal Mutual dealing with the rejection of certain rental agreements is no longer an issue here, as counsel for Debtors and Principal Mutual, after review of the plan provisions, stipulated that § 11.1 of the plan simply implements § 365 of the Code relating to rejection of any executory contracts or leases, as opposed to permitting the debtors to reject any leases regardless of whether they are true leases under the Bankruptcy Code. (See Trial Transcript, 11/13/91, Comments and Stipulation of Counsel, pp. 46, 51.)

21. Mr. & Mrs. Andrews, pro se shareholders, objected to the plan(s) alleging that they are disproportionately harsh to shareholders. They propose that a percentage of distributions to senior creditors, governmental agencies, and professionals should be allocated to shareholders. Mr & Mrs. Andrews failed to appear or present any evidence at the trial on confirmation.

22. One Alamo Center and CCNB Lenders merely reserved their rights to object to the plan in the event that the settlements of their claims were not approved by this court. These reservations are now moot as the settlements were approved on November 12, 1991. (See Orders Approving Compromise of Controversy, Docket Nos. 2017 & 2018.)

23. Shearson objected to the plan claiming that the plan: (1) unfairly discriminated against equity interests in favor of creditors, since the creditors were to receive transferable units in certain trusts, while shareholders (if Shearson voted for the plan) would receive nontransferable units in a separate trust; and (2) is not fair and equitable with respect to Class 15, the MMP Equity Interests, as certain classes senior to Class 15 may receive more than the allowed amount of their claim.

24. A limited objection was filed by Karl Butz, Jr. requesting that Debtors demonstrate that the stipulated amount of his Employee Stock Plan claim as set forth in Exhibit 8 to the plan was calculated consistently with other claimants in the same class. Counsel for Debtors announced in court that Butz's concerns were resolved prior to the hearing and that Butz would not be pursuing his objection. (See Trial Transcript, 11/13/91, pp. 11, 12.)

25. MCorp Class 15, consisting of the senior equity interests in MCorp (primarily

Shearson) voted to reject the MCorp plan. The Debtors then requested confirmation of the MCorp plan in accordance with § 1129(b) of the Bankruptcy Code, the "cramdown" provisions. (See Request for Confirmation of the Chapter 11 Plan of MCorp Pursuant to Section 1129(b) of the Bankruptcy Code, Docket No. 1947.)

### Confirmation

■ 26. Proponents of a plan have the burden of proving by a preponderance of the evidence that all of the requirements of § 1129(a) have been met. *Home Savings Ass'n v. Woodstock Assocs. I, Inc. (In re Woodstock Assocs. I, Inc.)*, 120 B.R. 436, 453 (Bankr.N.D.Ill.1990); *In re Rusty Jones, Inc.*, 110 B.R. 362, 373 (Bankr. N.D.Ill.1990); *In re Arnold*, 80 B.R. 806, 807 (Bankr.M.D.La.1987). Proponents' burden of proof under § 1129(b), the cramdown provision, calls for clear and convincing evidence. *In re Rusty Jones, Inc.*, 110 B.R. 362, 373 (Bankr.N.D.Ill.1990); *In Future Energy Corp.*, 83 B.R. 470 (Bankr. S.D.Ohio 1988); *In re Agawam Creative Marketing Assocs. Inc.*, 63 B.R. 612 (Bankr.D.Mass.1986); *In re Stoffel*, 41 B.R. 390 (Bankr.D.Minn.1984).

■ 27. In addition to considering the objections of creditors, the court has a mandatory independent duty to determine whether the plan has met all of the requirements necessary for confirmation. *Matter of Williams*, 850 F.2d 250 (5th Cir.1988); *In re Holthoff*, 58 B.R. 216 (Bankr. E.D.Ark.1985).

28. The bankruptcy court must consider the entire plan in the context of the particular facts and circumstances of the case. *In re D & F Construction, Inc.*, 865 F.2d 673, 675 (5th Cir.1989).

29. Subsection (a) of § 1129 enumerates the requirements governing confirmation of a plan. It contains eleven paragraphs setting forth standards with regard to the plan or the proponent of the plan. Although the legislative history states that the court is to confirm a plan if and only if all of the requirements of subsection (a) are met, the cramdown provisions in § 1129(b) do provide a way in which a plan may be confirmed even if the requirements of subsection (a)(8) are not met. See H.Rept. No. 95–595, p. 412, U.S.Code Cong. & Admin.News 1978, pp. 5787, 6368.

30. Section 1129(a)(1) makes one of the requirements of a plan (regardless of whether the method of cramdown is implemented) the compliance with the applicable provisions of Title 11. A number of the objections to the confirmation of the plan are based upon related provisions of the Code which are incorporated by § 1129(a)(1): Estimation and reconsideration of claims under § 502; Classification of claims under §§ 1122(a) and 1123(a)(1); Unequal treatment of claims within the same class under § 1123(a)(4); and Discharging the Debtors under § 1141.

31. Some of the other objections to confirmation relate to the other subsections of 1129(a); interests of creditors' test under § 1129(a)(7); acceptance by all classes per § 1129(a)(8) and acceptance by an impaired class per § 1129(a)(10); other objections involve the cramdown provision under § 1129(b) wherein the plan is alleged to violate the two prong test under § 1129(b): discriminates unfairly; and is unfair and inequitable.

### Estimation and Reconsideration of Claims per § 502 of the Code

■ 32. Section 502(c) requires the estimation of any claim the fixing or liquidation of which would unduly delay the administration of the case, such as a contingent claim or unliquidated claim, or any right to payment arising from a right to an equitable remedy for breach of performance. In effect, this subsection requires that all claims against the debtor be converted into dollar amounts. (See 124 Cong. Rec. H11094 (Sept. 28, 1978).

33. The Debtors' approach to this section is unusual in its wholesale use of § 502(c) on over $2 billion in contested claims, to be "capped" for all practical purposes on December 31, 1991, at $120 million. The plan is structured such that these "estimates" are subject to revision downward only, pursuant to 11 U.S.C.

§ 502(j). See, *inter alia,* Revised Third Proposed Plan, Article 14, § 14.1(a), Article 12, § 12.5, Article 1, §§ 1.1(s), (t), (am) and (ap).

34. Section 502(j) provides that a claim that has been allowed or disallowed may be reconsidered for cause, and allowed or disallowed according to the equities of the case. Thus, any claim estimated under § 502(c) is subject to adjustment per § 502(j) after the claim has been liquidated or the contingency removed.

35. The estimation process may fulfill the allowance requirement for purposes of § 1129(a)(9), but will not set the outer limits of a claimants' right to recover. Rather, the ultimate allowance of the claim will set that right. (See *In re MacDonald,* 128 B.R. 161, 167–168 (Bankr.W.D.Tex.1991).) The *MacDonald* court was confronted with and analyzed the estimation process under § 502 of post-petition administrative claims; however, it discussed, in dicta, the estimation under § 502 of pre-petition claims, the types of claims at issue in the instant case. *MacDonald* does not stand for the proposition that pre-petition claims can be permanently limited by the estimation process. In a footnote that court specifically stated that the estimation process provides for § 502(j) reconsideration of an estimated claim. *MacDonald,* 128 B.R. 161, 167, footnote 8 (Bankr.W.D.Tex.1991).

36. It is clear that the estimation procedure is not complete without the claimant's right to a § 502(j) reconsideration. If a plan proponent could cut off a claimant's right to a § 502(j) reconsideration, Congress' passage of that provision would be meaningless, and the result would be in contravention of the legislative history on the estimation procedure. The Debtors should not accomplish wholesale circumvention of the claim objection process by utilizing the arbitrary deadline of December 31, 1991 to advance previously entered scheduling deadlines on numerous objections to claims. In essence, the plan provisions terminate contested claimants' rights to any § 502(j) reconsideration upward as a result of the cap on the contested claims, the December 31, 1991 deadline for estab-lishing the cap, and the proposed end of January, 1992 distribution. This results in claimants' being put in a prejudicial posture in attempting to defend their proof of claims.

37. Although there may be an inherent risk in any plan that the reorganized Debtor will be unable to pay a contested claim as ultimately determined upon reconsideration, the terms and conditions of this plan make it a certainty that any reconsideration would be futile to claimant, and would only benefit the objector. Even if the plan specifically provided that a holder of a contested claim could seek reconsideration of the amount of the claim, no amount would have been placed, and designated, in the reserve to pay the claim at the higher amount.

*Classification Per § 1122(a)
and § 1123(a)(1)*

38. Classification has been said to be simply a method of recognizing differences in the rights of creditors which call for a difference in treatment. *Scherk v. Newton,* 152 F.2d 747 (10th Cir.1945) Section 1122(a) provides that claims and interests may be placed in a particular class only if such claims and interests are substantially similar to other claims and interests of that class.

39. The focus of classification is the legal character of the claim or interest as it relates to the assets of the Debtor. See *In re Greystone III Joint Venture,* 948 F.2d 134 (5th Cir.1991); *J.M. Morgan & Co. v. Missouri P.R. Co.,* 85 F.2d 351 (8th Cir.1936), *cert. denied* 299 U.S. 604, 57 S.Ct. 230, 81 L.Ed. 445 (1936); *In re AOV Industries,* 792 F.2d 1140 (D.C.Cir.1986).

40. It has been said that there is no reason to fragment classifications and uselessly increase their number where there is no substantial differentiation in the nature of the claims (See *In re Los Angeles Land & Invest, Ltd.,* 282 F.Supp. 448 (D.C.Hawaii 1968), *aff'd* 447 F.2d 1366 (9th Cir.1971)) and that, while there is no restriction on the total number of classifications, logistics and fairness dictate consoli-

dation, rather than proliferation of classes, so long as they are internally homogeneous. *In re AOV Industries, Inc., supra.* The key to proper classification would seem to be equality of treatment for similarly situated creditors or equity interest holders. See Bankr.L.Ed., Code Commentary and Analysis § 42.11.

41. Any classification process should not do substantial violence to any claimant's interest, nor should it uselessly increase the number of classifications unless there exist differences in the nature of claims. Creditors should not be arbitrarily classified or discriminated against in the classification process. (See Anderson, Classification of Claims and Interests in Reorganization Cases Under the New Bankruptcy Code, 58 American Bankruptcy LJ 99, Spring 1984).

42. Addressing the classification of the FDIC, the plans place the FDIC claims in the senior claims classes in MCorp and MCorp Financial and in the general unsecured class in MCorp Management. From a review of the plans it appears that this classification places the FDIC claims with intercompany and/or insider claims which are more properly characterized as equity contributions and should be separately classified. This classification of FDIC is questionable. Indeed, Debtors announced agreement that a separate classification of the FDIC claim would not be inappropriate. However, the FDIC's claims were estimated for plan voting purposes by the United States District Court, Southern District of Texas, at zero and the FDIC was not entitled to vote. As a practical matter, and in light of the court's other findings, it is not necessary to reach this particular objection.

43. As to any remaining objections to the classification scheme of the plans in general, the court finds that there is no violation of § 1123(a)(1). Section 1123(a)(1) requires that a plan designate, subject to § 1122 (classification of claims or interests dependent upon substantial similarity), classes of claims and classes of interests, and Debtors have complied with this provision.

*Unequal Treatment of Claims*
*per § 1123(a)(4)*

44. Section 1123(a)(4), incorporated by § 1129(a), states that the plan must provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such claim or interest. The fundamental premise of bankruptcy is that all creditors of the same class shall be treated equally.

45. The court finds that the plans violate § 1123(a)(4) as they do not provide the same treatment for each claim or interest of a particular class, and the holder of that claim or interest has not agreed to a less favorable treatment of such claim or interest.

46. The plan classifies Principal Mutual's claims in MCorp Class 13 which contains both contested and uncontested claims. Under the plan, although some money is set aside for contested claims, that amount may not be sufficient for all contested claims once resolved, since under the plan's estimation scheme a contested claimant's claim eventually could be allowed in an amount greater than the estimation cap. See, *inter alia,* Revised Third Proposed Plan, Article 14, § 14.1(a), Article 12, § 12.5, Article 1, §§ 1.1(s), (t), (am) and (ap). In such case, the contested claimant would not receive the same pro rata distribution on its allowed claim as would the noncontested claims in Class 13. This is due to the fact that the holders of Class 13 noncontested claims receive a pro rata payment based upon the allowed amount of their claims, while contested claimants bear the risk of only recovering a pro rata payment based upon the immediate estimation "cap." This "cap" may be less than the eventual allowed amount of the contested claims. The lower the amount of the "cap," the greater the potential for disparate treatment.

47. The plan provisions regarding the estimation process and the capped reserve for contested claims thus limit Debtors' ultimate exposure for payment of a contested claim to a pro rata amount that may be based on less than the full allowed

amount of such claim, while providing holders of uncontested claims their pro rata distribution based on the full allowed amount of their claims.

### Discharge of Debtors Per § 1141

■ 48. Confirmation of a plan in Chapter 11 for a corporation does not discharge a debtor if the plan provides for liquidation of all or substantially all of the property of the estate, that the debtor does not engage in business after consummation of the plan and that the debtor would be denied a discharge under § 727(a) if the case were a Ch. 7 proceeding. See 11 U.S.C. § 1141 and § 1129(a)(1).

49. Debtors would be denied a discharge under Section 727(a) because they are corporations. Section 727(a)(1) states that a court will grant a discharge unless the debtor is not an individual.

50. Article 14, § 14.8 of the Revised Third Proposed Plan specifies that the confirmation order "shall be a judicial determination of discharge of all liabilities of any and all of the Debtors and their successors in interest other than those obligations specifically set forth pursuant to this Plan." Revised Third Proposed Plan, Article 14, § 14.8.

51. The plan provides for the liquidation of substantially all of the property of the estate. The Debtors do not intend to engage in business after consummation of the plan. Revised Third Proposed Plan, Article 8.4. Under § 1141(d)(3)(C) debtors cannot be discharged in Chapter 11 because they are corporations and could not be discharged in a Chapter 7 case. The court finds that Debtors are not entitled to a discharge and that inclusion of this provision violates §§ 1129(a)(1) and 1141 of the Code.

■ 52. Pursuant to § 1127, only the proponent of a Chapter 11 plan can seek to have it modified. *Longardner & Associates, Inc.*, 855 F.2d 455 (7th Cir.1988), *cert. denied*, 489 U.S. 1015, 109 S.Ct. 1130, 103 L.Ed.2d 191 (1989). The Bankruptcy Court cannot, sua sponte, modify the Chapter 11 plan. See, *Goodman v. Phillip R. Curtis Enterprises, Inc.*, 809 F.2d 228 (4th Cir. 1987).

### Best Interests of Creditors Test Per § 1129(a)(7)

53. Section 1129(a)(7) provides that with respect to each class, the holders of claims or interests of that class must receive or retain under the plan on account of those claims or interests property of a value, as of the effective date of the plan, that is not less than the amount that they would receive or obtain if the debtor were liquidated under Ch. 7 on the effective date of the plan.

54. The court necessarily makes a liquidation valuation. The hypothetical liquidation value required in § 1129(a)(7) is to be made on the basis of evidence, not assumptions, but the process is not an exact science, nor is it a product of mere calculations. The exercise is hypothetical and valuation evidence is often replete with assumptions and judgments. See *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279 (Bankr.S.D.N.Y.1990).

55. The debtor has the burden of satisfying the Bankruptcy Court based on evidence that the plan is in the best interests of the creditors. *In re Gilchrist Co.*, 410 F.Supp. 1070 (E.D.Pa.1976).

56. The proposed plan of reorganization may not be confirmed where the evidence is not sufficient on which to base an independent factual determination that the proposed plan is in the best interests of the creditors pursuant to § 1129(a)(7). See *In re Produce Hawaii, Inc.*, 41 B.R. 301 (Bankr.Hawaii 1984).

■ 57. The court finds that the Debtors have failed to meet their burden of proof in establishing that the plans are in the best interests of the creditors pursuant to § 1129(a)(7). Debtors have failed to provide the court with evidence such that an independent factual determination could be made that the proposed plans are in fact in the best interests of the estate.

58. Although Debtors set forth various scenarios in their Disclosure Statement concerning valuation of assets and the ulti-

mate liquidation of the estates, they have failed to present sufficient substantive evidence in support of their contentions at the hearing on confirmation. The statements contained in the Disclosure Statement are unsubstantiated, and are not evidence.

59. It is well established that a court may take judicial notice of its own records. *In re Missionary Baptist Foundation of America, Inc.*, 712 F.2d 206 (5th Cir.1983). But this does not mean that a court can take judicial notice of the truth of the allegations contained there. See *Blumer*, 95 B.R. 143, 146 (9th Cir. BAP 1988); *Syracuse Engineering Co. v. Haight*, 97 F.2d 573 (2nd Cir.1938). The pleadings, including the Disclosure Statement, which were a subject of judicial notice, are therefore not accepted for the truth of the allegations contained therein, but for the fact that such pleadings were filed in this case.

60. Debtors provided two witnesses on the valuation of the Debtors' assets other than pending or prospective litigation. These were David Katzen, a Senior Manager in Ernst & Young's Valuation Services Group, and Scott Evans, a real estate appraiser, Member of the Appraisal Institute ("MAI") and Manager of Ernst & Young's Valuation Services Group who worked under Katzen's supervision. Their testimony did not provide the court with sufficient information on value of assets for a determination that these plans were indeed in the best interests of the creditors. The inadequacies will not be exhaustively cataloged here, but the following are noted.

61. There is no admissible evidence of the value of most of the real estate in which the Debtors have an interest. Testimony by Katzen, who is not a real estate specialist, as to the value of any of the real estate was excluded. (Trial Transcript, 11/26/91, p. 14–15.) Bartholow's own testimony was not based on any independent valuation by him or Debtors. He stated that the present value analysis contained in Debtors' Exhibit 20, MCorp, MCorp Financial & MCorp Management Schedule of Recovery & Liquidation Values as of 12/31/91, reflected the work product of Ernst and Young, rather than of the Debt-

ors. Trial Testimony of Bartholow, 11/24/91 p. 2–4.

62. The Debtors have interests in more than 20 substantial parcels of real estate, but only presented subject to cross-examination, appraisals with respect to six of those properties. Trial Testimony of Evans, 12/6/91 p. 13. With respect to six others, the Debtors simply had Ernst & Young review prior appraisals prepared by other appraisers. Ernst & Young expressly disclaimed any opinion as to the value of those assets or any agreement that the appraisals they reviewed had appropriately estimated market value. Trial Testimony of Evans, 12/5/91, p. 42. The court ultimately excluded the testimony of Evans as to Ernst & Young's review of appraisals by others.

63. With respect to the remaining real estate assets, Ernst & Young simply contacted brokers and conveyed information provided by the brokers to the Debtors. Ernst & Young did not inspect the properties or any comparables, or otherwise appraise or reach any opinion as to the value of the properties. Trial Testimony of Evans, 12/6/91, p. 20, 22.

64. As to those parcels on which Ernest & Young presented its own appraisals, Evans admitted that he personally inspected none of the supposed comparables or reviewed any leases or other documents that might affect an income valuation of any of the properties. Trial Testimony of Evans, 12/6/91, p. 12. In fact, Evans only inspected two of the six properties owned by Debtors on which Ernst & Young presented its own appraisal, and one of these was an exterior inspection only. See Debtors' Exhibit 39, Appraisal Reports at Certification No. 6; Trial Testimony of Evans, 12/6/91, pp. 12 & 53.

65. In addition, as to the six parcels on which Ernst & Young presented its own appraisals, the accuracy of the present value estimates is questionable. Evans acknowledged that although Ernst & Young had already done some of the work, it prepared the appraisal reports for the Debtors only after Katzen's testimony with respect to the value of the real estate had

been excluded, and in light of the confirmation litigation. Trial Testimony of Evans, 12/6/91, p. 12. Insepections of many of the comparables were not conducted and Evans admitted that Ernst & Young did not independently confirm all of the factual data surrounding the sales of the supposed comparables even though the usual guidelines of the Appraisal Institute require such work. Trial Testimony of Evans, 12/6/91, p. 24–27; Debtors' Exh. 39, Appraisal for Block 142 at I–2 (certification 5).

66. In addition, Evans acknowledged that Block 142, property in the central business district of Houston, was difficult to appraise and that he never visited the property until after Ernst & Young prepared its report and reached its valuation estimate. Trial Testimony of Evans, p. 29–30. Evans admitted that this is one of the most desirable undeveloped properties in downtown Houston and that Debtors had received previous purchase offers in the last year which were between $100 to $125 per square foot higher than the Ernst & Young appraisal. Trial Testimony of Evans, 12/6/91, p. 30–38.

67. As to Las Colinas, an undeveloped parcel in Irving, Texas, comparables sold at a higher price per square foot than the Ernst & Young appraised value. Further, the current listings considered by Ernst & Young were greater than the value at which Ernst & Young appraised this property. Trial Testimony of Evans, 12/6/91, p. 40–41.

68. In connection with Block 409 in the central business district of San Antonio, three of the six supposed comparable sales were to churches, raising an unanswered question as to whether those sales were arms length, or were by members of the churches who were prepared to sell at below market price for tax or other reasons. Another comparable was sold through sealed bid in a procedure not investigated by Ernst & Young. Trial Testimony of Evans, 12/6/91, p. 44–47. Both of the current listings reviewed in preparation for this appraisal were at greater per square foot prices than that in the appraisal by Ernst & Young. Trial Testimony of Evans,

12/6/91, p. 45–41. And though this property is leased, Ernst & Young did not review the lease agreement, and appraised the property as if no lease were in effect. Trial Testimony of Evans, 12/6/91, p. 42–43.

69. A 24.258 acre parcel of undeveloped land in Bedford, Texas was appraised by Ernst & Young using the comparable sales method, but without inspecting all of the comparables or verifying all of the information concerning the sales. Trial Testimony of Evans, 12/6/91, p. 49–50. Ernst & Young relied upon information provided by brokers concerning comparables even though Ernst & Young had obtained other information that reflected the information from the brokers was inaccurate and inconsistent. Trial Testimony of Evans, 12/6/91, p. 51.

70. As to the Debtors' partnership interest in a hangar at Dallas Love Field, Ernst & Young failed to review the partnership agreement before valuing the partnership interest, in contravention of the normal standards for appraisers. Trial Testimony of Evans, 12/6/91, p. 52–53, 56, p. 33–34. Evans admitted that although he was aware that the other partners had expressed an interest in acquiring the Debtors' interest, he did not speak with those partners or attempt to determine a price which might be acceptable. Trial Testimony of Evans, 12/6/91, p. 55–56.

71. In addition, as to the assets other than the real estate which were evaluated by Ernst & Young, Katzen's testimony leaves serious unanswered questions as to the accuracy of the Ernst & Young estimates and the methodology utilized in arriving at the estimates of present value. Katzen admitted that the Debtors' interest in the Mason Best Partnership was appraised without reviewing the partnership agreement, in contravention of normal appraisal standards. Trial Testimony of Katzen, 11/25/91, p. 33–34. The valuation was based on discussions Katzen had with two employees of the entity. Katzen was unable to recall the names and positions of these persons. Trial Testimony of Katzen, 11/25/91, p. 35.

72. Katzen was the sole witness to testify with respect to the present value of the Debtors' assets other than litigation or real estate, but he personally had primary responsibility only for the valuation of two of those assets, Columbia University Corporation (with one of his seniors) and Mason Best Limited Partnership interests. As to the remainder, he reviewed the valuations performed by others. Trial Testimony of Katzen, 11/25/91, p. 28, 62; Trial Testimony of Evans 12/6/91, p. 10–11.

73. Katzen acknowledged having little experience in valuation of banks and having failed to review important agreements in connection with the Debtors' interest in the Merchants National Bank. Trial Testimony of Katzen, 11/25/91, p. 49, 52. He was unable to identify the comparable banks or adjustments made to the comparables that Ernst & Young supposedly considered in valuing the Debtors' interest in the Merchants National Bank. Trial Testimony of Katzen, 11/25/91, p. 52–53. He could not explain the methodology used in the valuation of the MCorp Executive Loan Program other than to state that Ernst & Young employed some type of discounted cash flow analysis. Trial Testimony of Katzen, 11/25/91, p. 56–57.

74. In addition, Ernst & Young's analysis and Debtors' Exhibit 20 did not include a significant MCorp Financial asset that was identified in Debtors' Disclosure Statement as having a substantial estimated recovery value. (See Debtors' Exh. 20 and Exh. 2, p. 21 showing "Loans Facilities" as having an estimated recovery value of $876,268.00.) Debtors have acknowledged that they are unable to explain the absence of this asset from their Exhibit 20. Trial Testimony of Bartholow, 11/24/91, p. 13. Debtors' Exhibit 20, which shows MCorp, MCorp Financial, and MCorp Management's Schedule of Recovery and Liquidation Values as of December 31, 1991, also fails to attach any value at all to certain assets of the Debtors even though Ernst & Young has apparently not concluded that they have no present value, but rather that the value of the assets is "unknown." See Debtors' Exh. 20, pp. 1–2.

*Acceptance of All Classes Per § 1129(a)(8) and Acceptance by an Impaired Class Per § 1129(a)(10)*

75. Section 1129(b) specifically provides that the court can approve a plan if all of the applicable requirements of subsection (a) other than paragraph (8) are met with respect to a plan as long as it does not unfairly discriminate and is fair and equitable. 11 U.S.C. § 1129(b). Thus, since confirmation of the MCorp plan is sought under the cramdown provisions of the Code, compliance with § 1129(a)(8) is unnecessary as to that Debtor. However, § 1129(a)(8) is still applicable to both MCorp Financial and MCorp Management.

76. Regardless of the applicability of § 1129(a)(8) all debtors are required to comply with § 1129(a)(10) requiring acceptance by at least one impaired class.

77. Section 1129(b) cannot be used to cram down a plan which has not been accepted by any class of impaired creditors. Section 1129(a)(10) requires the approval of at least one impaired class of claims.

78. The presentation of evidence by Debtors on the balloting issues is inadequate and the court finds that the Debtors have failed to sustain their burden of proof in establishing that at least one impaired class in each of the plans has voted to accept the plan.

79. With regard to the MCorp Management plan, the Debtors submitted that members of Class 6, which is impaired, voted in favor of the plan. However, the court finds that the ballot cast by MTrust Corporation n/k/a Ameritrust Corp. should be disregarded and not counted as it was filed untimely and not voted by the entity that owned the claim.

80. Since this claim had been transferred to Ameritrust from MTrust as a result of the sale by Debtors of MTrust to Ameritrust postpetition, Ameritrust was the proper entity to vote the claim. However, the ballots reflect that the claim was voted by MTrust. FDIC Exh. 9.

81. There has been much testimony as to when the MTrust ballot was received. It was never time and date stamped, in contravention of Ameritrust's normal procedures. Trial Testimony of Asbury, 11/27/91, p. 115; 11/26/91, p. 46. The court is persuaded that the MTrust ballot was untimely, as demonstrated by the much-belabored "20–cent difference". The evidence strongly suggests that the person at Ameritrust who was to collect ballots for the Debtor did not have the MTrust ballot when he sent the ballots to Debtors' counsel. FDIC Exh. 37. The deadline for voting was November 5, 1991. (Order Approving Disclosure Statement, Docket Nos. 1642 & 1623) The ballots were "voted" (meaning added to the computer database maintained by Ameritrust) on November 7. Trial Testimony of Asbury, 11/25/91, p. 132; Trial Testimony of Steven Trotter, 12/2/91, p. 14 & 16. Mark Asbury of Ameritrust testified that when inputting ballot information, the lower of the ballot amount or an amount provided to Ameritrust by the Debtors' counsel was used. The error is illustrated in the 20–cent discrepancy: MTrust's scheduled claim was $111,752.53. The same amount was also entered for the ballot amount and the voting amount. Debtors' Exh. 40; Trial Testimony of Steven Trotter, 12/2/91, pp. 12–13. Sometime after November 21, when the FDIC issued a subpoena requesting copies of the computer database, the amounts in all numeric fields of the database were changed to reflect $111,752.33, the amount *actually shown on the face* of the MTrust ballot. This indicates that Ameritrust did not have the MTrust ballot in hand on November 5, 1991, the voting deadline. The evidence was subsequently "cleaned up" after issuance of the FDIC subpoena for the original tabulation evidence, which had disappeared. Stipulation by Debtors' counsel, Trial Transcript, 12/2/91, p. 20. And see FDIC's Exh. 26.

82. The objection that the MTrust ballot was cast by an insider, relates to Section 1129(a)(10) which requires the affirmative acceptance of the plan by at least one impaired class of claims unless all classes of claims are left unimpaired. Ac-ceptance by an impaired class must be determined without including any acceptance by any insider. This requirement has been enforced by the courts. See *In re Perdido Motel Group, Inc.*, 101 B.R. 289 (Bankr. N.D.Al.1989); *In re Valley Park Group, Inc.*, 96 B.R. 16 (Bankr.N.D.N.Y.1989).

83. An "insider" pursuant to § 101(31) of the Code includes an affiliate of the debtor. An affiliate includes a corporate entity that owns the debtor. 11 U.S.C. § 101(2)(B). Whether an entity is an insider is a question of fact that must be determined on a case by case basis. *Cimino v. Writer Corp. (In re Polk)*, 125 B.R. 293 (Bankr.D.Colo.1991); *In re Gilbert*, 104 B.R. 206, 210 (Bankr.W.D.Mo.1989).

84. The true test of an insider is one who has such a relationship with the debtor that their dealings with one another cannot be characterized as arms-length transactions. *Polk*, 125 B.R. at 296; *Gilbert*, 104 B.R. at 209. The controlling considerations are the closeness of the parties and the relative degree of control each has over the other. *Gilbert*, 104 B.R. at 210.

85. In the context of § 1129(a)(10), the determination of insider status is made at the time the vote is taken, not at the time the claim arises. *Gilbert*, 104 B.R. at 211; *In re Featherworks Corp.*, 25 B.R. 634 at 640 (Bankr.E.D.N.Y.1982), *aff'd*, 36 B.R. 460, 464 (E.D.N.Y.1984).

86. Many connections still exist between MTrust, Ameritrust and MCorp. Ameritrust still owes the Debtors on a $15 million note executed in connection with the sale of MTrust. Ameritrust is the voting tabulator for the balloting in connection with these plans. Many prior MCorp employees are now Ameritrust employees. Trial Testimony of Mark Asbury, 11/25/91, pp. 122–125.

87. The court finds that MTrust is not an insider as that term is defined in the Code and interpreted by case law. Although the evidence presented on insider status demonstrates Ameritrust had a possible bias, it does not rise to the level necessary for the court to find that it is an insider. Although two years ago, MTrust

n/k/a Ameritrust Corp. was an affiliate of MCorp Management, it is not currently an affiliate of MCorp Management or any of the Debtors. This claim arose from stock transfer agent services performed by MTrust for the Debtors shortly prepetition. After the commencement of the case, the Debtors sold MTrust to Ameritrust.

88. With regard to § 1126(c), MCorp Class 14 (Junior MCorp claims) and MCorp Financial Class 7 (Junior MFin Claims) Debtors have failed to present adequate evidence to show that these classes meet the standards for assenting impaired classes in relation to the numerosity requirement. In both of these classes, claims based on bearer bonds were voted through the use of a Master Ballot. FDIC's Exh. 12. The total number of holders are not known such that a determination could be made as to whether a majority in number has accepted. The Debtors' calculation of the European bonds voting reflects that 34 ballots were received with 33 being in favor and one opposed. As many as 80 holders of claims against the Debtors may have voted against the plan. FDIC Exh. 12. The bonds in these classes are bearer bonds, the bearers of which are traditionally anonymous. Debtors' witnesses, Jane Sullivan and Mark Asbury testified that they did not know whether there were 80 separate true holders of the bonds voting against the plan but that the vote was counted as one ballot.

■ 89. Acceptance by a class is acceptance by the holders of 2/3rds in dollar amount and a majority in number of claims of that class. See 11 U.S.C. § 1126(c). The evidence presented by Debtors was not adequate.

90. Additionally, pursuant to § 1129(a)(10) and in light of this court's ruling that Debtors failed to establish that MCorp Class 14 was an impaired accepting class, the court addresses the issue of whether the Debtors have established that MCorp Class 9 is an impaired accepting class such · that compliance with § 1129(a)(10) is satisfied. With regard to MCorp Class 9 the court finds that two of the ballots (Frank Robinson and Morrison

Smith) received by Ameritrust should be counted at zero due to the failure of the claimants to fill in the voting amounts when completing their ballots. The procedures adopted by Ameritrust require that these ballots not be counted. Trial Testimony of Asbury, 11/26/91, p. 67. However, Ameritrust counted these ballots at the scheduled amounts, which amounts were provided by Debtors to Ameritrust. Asbury acknowledged that the votes were originally tabulated at zero according to the adopted procedure, but that the votes were later changed to the scheduled amounts, i.e., $150,000.00 and $169,000.00. Asbury admitted that once these ballots were counted at zero, then Class 9 becomes a rejecting class. Trial Testimony of Asbury, 11/26/91, pp. 67–70; FDIC Exhs. 18, 28.

91. The court having found that these two ballots are to be counted at zero, the issue arises as to whether Jerry Gates, a member of Class 9, could, after the ballot deadline (and after Asbury's testimony), change his original rejecting ballot to one of acceptance, resulting in MCorp Class 9's accepting the plan as an impaired class, thus satisfying the requirements of § 1129(a)(10) for the MCorp plan.

92. A hearing was held on the Motion to Change Vote on 12/19/91. By separate Memorandum Opinion and Judgment signed January 6, 1992, the court denied the Motion to Change vote pursuant to Bankruptcy Rule 3018(a), as a showing of sufficient cause absent improper motivation had not been demonstrated.

93. The court finds that MCorp Cl 9 is a rejecting class and thus Debtors have not demonstrated that there is an MCorp impaired accepting class pursuant to § 1129(a)(10).

94. In light of the court's ruling on other issues it is not necessary to address whether the procedures for the ballot tabulations were proper; however, the court notes that the implementation of the adopted procedures is questionable. Ameritrust, the ballot tabulation agent, did not account for all of the ballots received. Their database reports reflect that there

were 36 Class 6 ballots but only 11 were counted and introduced into evidence. Testimony of Jane Sullivan, 11/15/91, pp. 79–80; Trial Testimony of Mark Asbury, 11/27/91, pp. 14–15; Stipulation of Debtor's Counsel, Trial Transcript, 11/27/91, pp. 14–15.

95. Further, Ameritrust did not tabulate the ballots but instead "audited" those given to Mr. Asbury by Debtors' counsel against a summary chart prepared and given to him by Debtors' counsel. Trial Testimony of Asbury, 11/27/91, p. 8; Debtors' Exh. 24. The database set up by Ameritrust to count the ballots was not used in the tabulation presented to the court and there is no evidence that the ballots audited by Asbury match the actual ballots originally received by Ameritrust. Additionally, the database entries were changed or as Debtor contends "cleaned up" in response to a subpoena to produce this database. See Stipulation of Debtor's Counsel, Trial Transcript, 12/2/91, p. 20.

### CramDown Provisions

96. Section 1129(b) provides a test, based in fairness and equity to the creditors, which may be applied at the request of the proponent of the plan under circumstances in which an impaired class of creditors has not accepted the plan. Section 1129(b) provides that a debtor may "cram down" its plan over the objection of a creditor "if the plan does not discriminate unfairly and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). Debtor MCorp has requested "cramdown" of the plan over the negative vote of Shearson (Class 15).

97. The requirement that a plan not "discriminate unfairly" with respect to a class was included in § 1129(b) "for clarity." The criterion of unfair discrimination is not derived from the fair and equitable rule or from the best interests of creditors test. Rather it preserves just treatment of a dissenting class from the class' own perspective. See H.R.Rep. No. 595, 95th Cong., 1st Sess. 416–417 (1977), U.S.Code Cong. & Admin.News 1978, pp. 6372, 6373.

98. Reducing "discrimination" to its bare essentials, a dissident class must not only receive "fair and equitable" treatment but the class must also receive treatment which allocates value to the class in a manner consistent with the treatment afforded to other classes with similar legal claims against the debtor. 5 Collier on Bankruptcy ¶ 1129.03 at 1129–69 (15th ed. 1991); See *Matter of Sandy Ridge Development Corp.*, 889 F.2d 663 (5th Cir.1989).

99. "In a nutshell, if the plan protects the legal rights of a dissenting class in a manner consistent with the treatment of other classes whose legal rights are intertwined with those of the dissenting class, then the plan does not discriminate unfairly with respect to the dissenting class." Klee, *All You Ever Wanted to Know About Cram Down Under the Bankruptcy Code*, 53 Am.Bankr.L.J. 133, 142 (1979).

100. Applying the "unfair discrimination standard" to those claimants within various classes whose claims are contested, as discussed in the context of § 502, *supra*, the court finds that the MCorp plan discriminates unfairly against holders of contested claims based upon the timing of the perfection of their claim against the estate.

101. The court further finds the MCorp plan to "unfairly discriminate" and be less than "fair and equitable" with regard to its treatment of equity holders. While equity holders are not uncommonly left with zero in corporate reorganizations pursuant to the Bankruptcy Code, the manner in which they have here come to that end is violative of standards incorporated in 11 U.S.C. § 1129(b).

102. The requirement of the Code that the plan be "fair and equitable" incorporates a modified version of the absolute priority rule. According to the absolute priority rule, a plan must provide that an impaired non-accepting class of creditors be paid in full with respect to their claims, or that no interest junior to that class receive any distributions under the plan with re-

spect to the junior claimants' prepetition claims or interest.

103. Although many of the factors interpreting "fair and equitable" are specified in paragraph (2), others, which were explicated in the description of § 1129(b) in the House report, were omitted from the House amendment "to avoid statutory complexity and because they would undoubtedly be found by a court to be fundamental to 'fair and equitable' treatment of a dissenting class." For example, a dissenting class should be assured that no senior class receives more than 100 percent of the amount of its claims. While that requirement was explicitly included in the House bill, the deletion was intended to be one of style and not one of substance. The safeguards that no claim or interest receive more than 100 percent of the allowed amount of such claim or interest and that no class be discriminated against unfairly will insure that the plan is fair and equitable with respect to the dissenting class of interests. See 5 Collier on Bankruptcy, ¶ 1129.03, p. 1129–56 and 1129–60 (15th ed. 1991) quoting the remarks of the sponsors of Pub.L. No. 95–598 describing § 1129(b).

104. Thus, in applying the "fair and equitable" standard contained in § 1129(b), the court need only determine that no class senior to the dissenting class will receive more than full compensation for its claims or interests and that members of the dissenting class either receive full compensation for their claims or interests or no junior class receives any distribution or retains any interest after confirmation of such plan. 5 Collier on Bankruptcy, ¶ 1129.03, p. 1129–94 (15th ed. 1991).

105. If former stockholders' interests are eliminated, a valuation is required to make sure that the senior classes of claims are not being provided for more than in full. If former shareholders' interests are impaired and a class of creditors is provided for more than in full, the plan will not be confirmed. Conversely, for a plan to be confirmed when stockholders are eliminated, creditors must not be provided for more than in full. See, e.g., Klee, *All You Ever Wanted to Know About Cram Down Un-*

*der the Bankruptcy Code,* 53 Am.Bankr. L.J. 133, 148, 149, 166 (1979); See *In re Future Energy Corp.,* 83 B.R. 470, at 495 (Bankr.S.D.Ohio 1988) wherein that court rejected the argument made by the debtors here, and held that the overpayment of senior creditors is violative of the fair and equitable standard; *In re Walat Farms, Inc.,* 70 B.R. 330, 335 (Bankr.E.D.Mich. 1987).

106. The court finds that the terms of the MCorp plan violate § 1129(b) in that it is not fair and equitable to equity interests. The plan includes a provision which establishes no upper limit on the amount that junior creditors of the Debtors (who are senior to the rejecting equity class) may receive. Trial Testimony of Bartholow, 11/15/91, p. 41; Bartholow Dep., p. 52. This is due to the nature of a particular asset allocated to the Junior Creditors—a lawsuit against the FDIC in the Northern District of Texas in which a summary judgment as to liability has been obtained by Debtors, MCorp and MCorp Financial, against the FDIC. Damages remain to be determined. These could be in excess of $327 million, plus interest, but an addition of this much would yield 100% of principal, and in all likelihood 100% of principal plus interest to Junior Creditors. MCorp argues that a large judgment is unlikely, and is subject to appeal, and that collectability is uncertain. However, the Junior Creditors bargained forcefully in anticipation of a substantial recovery. Relatively simple plan language allocating to equity holders any excess from this asset above 100% of principal (or principal plus interest if parties chose to litigate that issue) for Junior Creditors would have eliminated this problem. *That option was considered and rejected.* Thus the Junior Creditors may receive distributions of more than 100 percent of the allowed amount of their claim. See Revised Third Proposed Plan; Debtors' Exh. 2 at p. 4; Lehman Exh. 4; Bartholow Dep., p. 54; Trial Testimony of Bartholow, 11/15/91, pp. 21, 22.

107. These provisions in the plan were "insisted" upon by the holders of the Junior Claims, and this demand was made in

connection with the Plan only after the Debtors obtained the favorable summary judgment ruling on liability in the litigation against the FDIC pending in the United States District Court for the Northern District of Texas. Trial Testimony of Bartholow, 11/15/91, p. 48; Bartholow Dep., p. 47. The court notes that the holders of Junior Claims are sophisticated and include investment banking houses, broker-dealers, banks, and regional investors. Their sophistication extends to the valuation of assets. See Trial Testimony of Bartholow, 11/15/91, p. 49.

108. The Debtors' own projections in their Disclosure Statement of the likely recoveries under various scenarios demonstrate their contemplation of the result that holders of Junior Claims could receive more than payment in full. (See Debtors' Exh. 2, Revised Third Disclosure Statement, & Plan, at B–11).

*The "Death Trap Provision"*

 109. Debtors have included in their plan(s) a provision authorizing some possible payout to equity (MCorp classes 15, 16, 17) upon a favorable vote by Class 15 (Shearson), but none to these three classes upon a negative vote by Class 15. Shearson has colorfully labelled this the "death trap provision." While Shearson's choice of language is indeed colorative, it is also reasonably descriptive. Class 15 voted against the plan(s). Thus Classes 16 and 17 not only lost any possible distributions, but also the right to vote effectively, since they could not know until after Shearson had cast its vote (due on the same date as that of all other claimants) what their own status was.

110. The asset which the MCorp plan conditionally made available to Shearson and equity classes junior to it was potential "overflow" from the Debtors' Dallas Federal District Court litigation with the FDIC, discussed at paragraphs 106–109, *supra.* This provision is egregious in its "carrot and stick" approach to the problem of how to treat, in a plan of reorganization, an asset as highly speculative as possible recovery on a lawsuit won thus far at the United States District Court level as to liability against the FDIC.

111. There is no authority in the Bankruptcy Code for discriminating against classes who vote against a plan of reorganization. See *In re Allegheny Intern., Inc.,* 118 B.R. 282, 304 (Bankr.W.D.Pa. 1990) wherein the court found discriminatory a provision in that plan which provided that if any class of equity holders rejects the plan, then that class and any junior class would not receive any distribution.

112. The court finds that this MCorp Plan provision results in the plan's not being fair and equitable. Further, this provision also results in unfair discrimination.

113. A Chapter 11 plan which does not meet the standards set forth in § 1129(b)(2) (the provision encompassing cramdown) cannot be fair and equitable; however, technical compliance with all requirements of § 1129(b)(2) does not assure that the plan is fair and equitable. Section 1129(b)(2) sets minimal standards plans must meet. It is not to be interpreted as requiring that every plan not prohibited be approved. The court must consider the entire plan in the context of the rights of creditors under state law and the particular facts and circumstances when determining whether the plan is fair and equitable. See 5 Collier on Bankruptcy ¶ 1129.03 at 1129–70 (15th ed. 1991); *Matter of Sandy Ridge Development Corp.,* 881 F.2d 1346, 1352 (5th Cir.1989); *In re D & F Construction, Inc.,* 865 F.2d 673, 675 (5th Cir.1989).

114. Even had the Debtors technically complied with all requirements of § 1129(b)(2), after considering the entire plan under the particular facts and circumstances of this case, this court finds that the plan is not fair and equitable.

For the reasons discussed above, confirmation of the plan(s) of MCorp, MCorp Financial, Inc., and MCorp Management is denied. A separate Judgment will be entered.