**SOUTHERN PACIFIC TRANSPORTATION COMPANY and St. Louis Southwestern Railway Company, Appellants,**

v.

**VOLUNTARY PURCHASING GROUPS, INC., Appellee.**

No. 3:98–CV–051.

United States District Court
E.D. Texas,
Paris Division.

Aug. 28, 2000.

Mark A. Calhoun, Michael Calvin Wright of Winstead, Sechrest and Minick, Dallas TX, David W. Elrod, Elizabeth Reding Gambrell of Calhoun and Stacy, Dallas, TX, for Plaintiffs.

James Patrick Kelley of Ireland, Carroll and Kelley, Tyler, TX, Pickelman, Strasburger & Price, LLP, Dallas, TX, for Defendant.

*MEMORANDUM OPINION REVERSING THE BANKRUPTCY COURT'S CONFIRMATION ORDER AND REMANDING CASE FOR FURTHER PROCEEDINGS*

SCHELL, District Judge.

This case is on appeal from the United States Bankruptcy Court for the Eastern District of Texas, Paris Division.[1] The Appellants, Southern Pacific Transportation Company and St. Louis Southwestern Railway Company (collectively the "Railroads"), challenge the Bankruptcy Court's order confirming the Debtor's First Amended Plan of Reorganization ("Plan"), as well as the Bankruptcy Court's issuance of two mandatory injunctions implementing environmental settlement agreements incorporated into the Plan. The Railroads' appeal is opposed by the Debtor, Voluntary Purchasing Groups, Inc. ("VPG"), and by the Official Unsecured Creditors' Committee (the "Committee"). The court has jurisdiction over this matter pursuant to 28 U.S.C. § 158(a). Having carefully reviewed the submissions of the parties in light of the record on appeal, the circumstances of this case, and the applicable law, the court finds that the Bankruptcy Court's confirmation order must be REVERSED and this case must be REMANDED.

## I. BACKGROUND

The procedural history and factual background culminating in the filing and consolidation of the Railroads' three bankruptcy appeals is lengthy and complex. While a complete recitation of that history and background is not necessary for present purposes, an overview of relevant facts and events is in order.

VPG is a Texas corporation based in Bonham, Texas, that began operations in 1968 as a nonprofit agricultural cooperative. VPG is owned by its patron stockholders and primarily operates as a wholesaler of agricultural chemicals and lawn and garden fertilizers and other products. Substantially all of VPG's products are sold to its patrons, who then resell those products in locally owned feed stores and lawn and garden centers. The purchase of goods by patrons serves to infuse VPG with operating capital. With the use of that capital, VPG is able to conduct its business on a cash basis and obtain discounts and other advantages from vendors. VPG's approximately 8000 patrons benefit from increased purchasing power and discounted supply costs, thereby enabling them to compete economically with larger retailers in the same market.

As a nonprofit cooperative, VPG receives certain tax advantages under the Internal Revenue Code. To qualify for such advantages, VPG must return any profits earned to its patrons at the end of each fiscal year. That "patron refund" or "patronage dividend" is paid to VPG's pa-

1. The Bankruptcy Court's opinion below is reported as *In re Voluntary Purchasing Groups, Inc.*, 222 B.R. 105 (Bankr.E.D.Tex. 1998).

trons in the form of cash or patronage stock in an amount proportional to the purchases made by each patron. The amount of money retained by VPG when it issues patronage stock also serves as operating capital for the cooperative. Each patron holds the stock until it is redeemed for cash when VPG's board of directors votes to permit such a redemption.[2] Patrons pay income tax on the patronage stock as if they had received cash and no interest or dividends accrue on the stock. In addition to having a limited right of redemption, patronage stock provides its holders with voting rights to elect members of VPG's board of directors. However, patrons cannot acquire more than 1% of available voting stock and patron refunds are satisfied with non-voting stock or cash once that percentage is reached.

Between the late 1960s and early 1970s, VPG owned and operated a facility known as the Hi–Yield chemical plant in Commerce, Texas, where arsenic-based herbicides and desiccants were manufactured. The Railroads own and maintain property that is located in close proximity to the Hi–Yield site and at all relevant times have apparently maintained license agreements covering the use and maintenance of a track and an unloading pit located on VPG's property. At different times during the period when VPG and its predecessors operated the Hi–Yield plant,[3] hazardous substances were allegedly released into the environment at the Commerce site, which encompasses the Hi–Yield plant, several contiguous commercial properties including that owned by the Railroads, an intermittent stream known as Sayle Creek, and neighboring residential properties. It is undisputed that the Commerce site is contaminated with arsenic. What is disputed is which party is most culpable for the contamination and who should bear the cost of remediation.

Following investigations by both state and federal environmental agencies, VPG, the Railroads, and other entities were ordered in 1988 to eliminate the release or threatened release of hazardous waste materials from their respective properties. In addition, those parties were required to stabilize any contaminated material and to close off their properties as a solid waste landfill. In connection with the closure of the Hi–Yield plant and related clean-up activities, VPG obtained a tract of land near Ridgeway, Texas, for the purpose of depositing the residues removed from the Commerce site. Subsequent testing at the Ridgeway site by state regulators in the mid 1990s determined that releases of hazardous materials may have occurred there as well. VPG was thus directed to propose a plan for taking appropriate remediation measures at the Ridgeway site too. In addition to the Commerce and Ridgeway sites, investigations have apparently uncovered possible contamination at VPG's current headquarters in Bonham, Texas, as well as at another facility in Bonham previously operated by VPG.

Beginning in 1994, a flood of lawsuits were filed against VPG by plaintiffs asserting personal injury, wrongful death, and property damage claims stemming from their alleged exposure to harmful sub-

---

2. Various factors determine if, when, and to what extent patron refunds will be paid in any given year. For example, patron refunds are contingent upon VPG's profitability and will not be paid if the cooperative fails to realize a profit. *See* VPG's Bylaws at ¶ 47, attached as Plaintiff's Ex. 1 to Doc. 861 of Record (hereinafter "R."). Additionally, the board of directors has the discretion to set aside funds for the payment of applicable income taxes owed by VPG and the elimination of VPG's accumulated deficit. *See id.* It should also be noted that VPG is prohibited under state law from redeeming stock if doing so will force the corporation into insolvency. *See* Tex. Bus. Corp. Act Ann. art. 2.38(B)(1). Once redemption is permitted, it occurs over several years at a fixed rate of $1.05 per share, unless the stockholder sells its stock to another patron at a price negotiated between them. *See* VPG's Bylaws at ¶ 40.

3. Through a series of conveyances and transfers VPG assumed the assets and liabilities of those entities that previously owned the Hi–Yield site. *See* R. 434 at 14–15.

stances relating primarily to the Commerce site. The Railroads also filed suit against VPG in November 1994 seeking indemnification and contribution under §§ 107(a) and 113(f) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"),[4] in addition to asserting various related and ancillary claims. The Railroads seek to recover the costs that they have incurred and will incur in response to releases or threatened releases of hazardous substances from the Commerce site. They argue that because they never generated, stored, processed, or disposed of hazardous substances or waste at the site, they should not be responsible for funding more than their equitable share of the clean-up.

By 1996, seventeen tort lawsuits had been filed against VPG involving claims by more than 2000 plaintiffs. The Railroads and others have been named as co-defendants with VPG in each tort lawsuit and the defendants have filed cross-claims or counter-claims against each other. In response to these lawsuits, VPG filed a voluntary petition for Chapter 11 bankruptcy protection on June 10, 1996. The Railroads' filed a Proof of Claim for $7,261,175 in environmental property damages and related attorneys fees. Other Proofs of Claim filed in widely varying amounts included those of numerous tort claimants asserting personal injury and property damage claims, those of various trade creditors seeking payment of bills, those asserted by the State of Texas for the remediation of certain contaminated properties, and those filed by VPG's patrons seeking their 1996 patronage refunds and the recovery of sums owed on their patronage stock.

Pursuant to the provisions of Chapter 11, VPG filed its proposed Plan of Reorganization and subsequently amended the Plan then modified it five times. The Plan creates thirteen classes of creditors.[5] The Railroads' claim was allowed for voting purposes by the Bankruptcy Court and was placed in Class 9 along with other allowed environmental property damage claims. When VPG's Plan was presented to creditors eligible to vote, the Plan was ultimately accepted by the majority of creditors in each class except Class 9, which was deemed a rejecting class due to the Railroads' many objections to the Plan. One of the Railroads' chief objections concerned the Plan's incorporation of CERCLA environmental settlement agreements between VPG and the State of Texas. The Railroads argued that the Bankruptcy Court lacked jurisdiction to confirm a plan containing such agreements because doing so would involve the substantial and material consideration of a federal statute other than the Bankruptcy Code. The Railroads subsequently filed a motion with this court for mandatory withdrawal of the reference pursuant to 28 U.S.C. § 157(d).

Confirmation hearings were held in June and August of 1997 and the Bankruptcy Court confirmed VPG's Plan on June 29, 1998, over the Railroads' objections and before this court ruled on the motion to withdraw reference. On July 7, 1998, the Railroads filed a notice of appeal. In addition to their challenge to the Bankruptcy

---

4. 42 U.S.C. § 9607 & 9613(f), as amended by the Superfund Amendments and Reauthorization Act of 1986, Pub.L. No. 99–499, 100 Stat. 1613 (1986).

5. Class 1 consists of allowed priority claims; Class 2 consists of allowed assumed lease claims; Class 3 consists of all allowed administrative convenience claims; Class 4 consists of allowed general unsecured claims such as trade creditor claims; Class 5 consists of allowed environmental governmental unit claims by the State of Texas; Class 6 consists of allowed environmental governmental unit claims by the United States; Class 7 consists of allowed environmental personal injury claims; Class 8 consists of unknown/future personal injury claims; Class 9 consists of allowed environmental property damage claims; Class 10 consists of allowed cash election claims; Class 11 consists of allowed 1996 patronage refund claims; Class 12 consists of allowed patronage stock redemption claims; and Class 13 consists of the holders of VPG's common stock.

Court's jurisdiction to approve CERCLA settlement agreements, the Railroads' appeal asserts a host of alleged errors that can be summarized as follows: the Bankruptcy Court failed to make adequate findings of fact and conclusions of law to demonstrate that the Plan was confirmable; the Plan violates the absolute priority rule by providing for the payment of junior creditors' interests before dissenting classes of senior creditors are paid in full; the Bankruptcy Court incorrectly applied the best interest of creditors test by relying on erroneous liquidation values and discount factors and by failing to determine the Plan's effective date; and the Bankruptcy Court abused its discretion by permitting VPG to call expert witnesses who were not qualified or properly disclosed and whose testimony exceeded the scope of the parties' prior stipulation.

On July 2, 1998, even before the Railroads filed their notice of appeal, the Railroads filed an emergency motion asking this court to stay the Bankruptcy Court's confirmation order pending appeal. On July 6, 1998, the undersigned denied the requested stay because the Bankruptcy Court had not yet had an opportunity to consider a similar motion pending before it and had scheduled a hearing for that very purpose on July 8. When the Bankruptcy Court denied the Railroads' motion for stay two days later, the Railroads again filed an emergency motion for stay with this court on July 9, 1998. Finding that the Railroads had not demonstrated that they would suffer irreparable harm if their motion were denied and that a stay would, in fact, harm VPG and its other creditors, the court again denied the Railroads' motion. In light of the Bankruptcy Court's entry of the confirmation order, the court also later denied as moot the Railroads'

motion for mandatory withdrawal of the reference of the CERCLA environmental settlement agreements.

On July 10, 1998, the Railroads appealed this court's denial of their motion for stay to the Fifth Circuit Court of Appeals and asked that court to grant a temporary stay of the confirmation order pending appeal. Because VPG had not yet attempted to consummate its Plan, the Fifth Circuit denied the Railroads' requested stay as premature but reserved unto them the right to renew the motion should VPG begin making distributions prior to the Plan's effective date. The Railroads renewed their motion with the Fifth Circuit on November 9, 1998, in response to an order by Judge Barefoot Sanders of the Northern District of Texas declaring the Plan's effective date to be November 16, 1998.[6] The Fifth Circuit denied the Railroads' second motion for temporary stay without elaboration on November 13, 1998.

Meanwhile, the Railroads filed two additional notices of appeal on September 4, 1998. Those appeals challenge two related mandatory injunctions entered by the Bankruptcy Court at the request of VPG. VPG sought approval for the injunctions on August 26, 1998, so that its CERCLA settlement agreements with the State could begin to be consummated. When the Bankruptcy Court granted the request and entered the mandatory injunctions the very next day, the Railroads promptly appealed each order. By motion of the Railroads, this court subsequently consolidated all three pending appeals on the ground that each appeal addressed the Bankruptcy Court's jurisdiction to approve CERCLA-related settlements.

On September 20, 1999, the Fifth Circuit issued its opinion on the Railroads' appeal of this court's order denying a stay of the

---

6. Shortly after VPG filed its bankruptcy petition, it was determined that the U.S. District Court for the Northern District of Texas was the appropriate venue for the litigation of the tort claims in this action given that the claims arose there. Thus, by order of this court dated October 28, 1996, all personal injury,

property damage, and wrongful death lawsuits were transferred to the Northern District. All CERCLA causes of action were also later transferred to Judge Sanders for apportionment of liability among all potentially responsible parties for the contamination of the various properties involved in this action.

confirmation order pending appeal.[7] Reversing the court's order and remanding with instructions to enter a stay, the Fifth Circuit found that the undersigned had failed to consider the Railroads' likelihood of success on appeal and had thus misperceived the balance of hardships facing the parties.[8] The panel opinion stated: "Close review of the bankruptcy court's orders persuades us that the appellants have identified serious appellate issues that could require reversal of the confirmation order, or, at least, remand for its clarification."[9] The panel specifically expressed concerns about the Bankruptcy Court's failure to address the applicability of the absolute priority rule, as well as its consideration of improper policy issues and arbitrary discount factors when applying the best interest of creditors test. In the Fifth Circuit's view, "the balance of hardships clearly weighed in favor of granting a stay rather than permitting a procedurally flawed, and therefore, incomplete, plan to be confirmed and consummated."[10] The opinion went on to note that either this court or the Bankruptcy Court would have to make an independent determination of when the Plan's effective date occurs.

Prior to issuance of the Fifth Circuit's opinion, VPG and the Committee filed a motion to dismiss the underlying appeal of the Bankruptcy Court's confirmation order on equitable mootness grounds. They argued that the Plan had been substantially consummated and reversal would be inequitable given that VPG had begun taking significant steps to implement the Plan beginning on November 16, 1998, the date adjudicated by Judge Sanders to be the Plan's effective date. In an Order dated March 7, 2000, the court denied the motion to dismiss appeal as equitably moot, finding that VPG and the Committee had not carried their burden of showing that the Plan had been so substantially consummated that effective judicial relief is no longer available to the Railroads. The court also found the motion barred by the law of the case doctrine because the Fifth Circuit had previously denied a nearly identical motion filed by the Committee.

## II. DISCUSSION

### A. Standard of Review

■ On appeal, this Court reviews the Bankruptcy Court's findings of fact for clear error and its conclusion of law de novo.[11] Under the clearly erroneous standard, a bankruptcy court's findings of fact will be reversed only if, considering all the evidence, the appellate court is left with the definite and firm conviction that a mistake has been made.[12] With these standards in mind, the court will turn to a consideration of the main points of error raised by the Railroads' appeal.

### B. Bankruptcy Court Jurisdiction to Approve CERCLA Agreements

■ As previously noted, one of the central issues of the Railroads' appeal is whether the Bankruptcy Court had jurisdiction to approve and then issue mandatory injunctions implementing VPG's CERCLA settlement agreements with the State. The Railroads have contended since the time the settlements were first incorporat-

7. See In re Voluntary Purchasing, No. 98–40793, 196 F.3d 1258 (5th Cir. Sept.20, 1999) (unpublished).

8. In response to the Fifth Circuit's opinion, the court entered an order staying all matters in this case pending resolution of the Railroads' appeal. That stay is presently in effect.

9. In re Voluntary Purchasing Groups, Inc., No. 98–40793 at *3, 196 F.3d 1258.

10. Id. at *5.

11. See In re Hamilton, 125 F.3d 292, 295 (5th Cir.1997).

12. See In re Kemp, 52 F.3d 546, 550 (5th Cir.1995); see also Fed.R.Bankr.P. 8013 ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses").

ed into VPG's Plan that only an Article III judge could approve those agreements. They argue that the process of approving such agreements requires a court to determine whether the agreements are fair, reasonable, and faithful to CERCLA's objectives, which in turn requires a determination of the various parties' proportionate liability under CERCLA. Because those determinations necessarily involve the substantial and material consideration of a federal statute other than the Bankruptcy Code, according to the Railroads, 28 U.S.C. § 157(d) divests the Bankruptcy Court of jurisdiction to make them. The court agrees.[13]

 Section 157(d)of Title 28 provides that "[t]he district court shall, on timely motion of a party, withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." That provision reflects Congress' view that the jurisdiction of specialized courts should be limited to areas within the realm of their expertise.[14] In addition, § 157(d) assures litigants that under certain circumstances their assertion of a federally created right will be considered by an Article III judge who considers laws regulating interstate commerce on a regular basis.[15] Still, bankruptcy courts do provide a high degree of expertise and efficiency in the adjudication of bankruptcy matters. Hence, withdrawal of a matter from a bankruptcy

court is required only when "substantial and material consideration" of a federal statute other than the Bankruptcy Code is necessary to the resolution of a case or proceeding.[16] Withdrawal is not mandatory in cases that require only the " 'straightforward application of a federal statute to a particular set of facts.' "[17] Rather, withdrawal is in order only when litigants raise " 'issues requiring significant interpretation of federal laws that Congress would have intended to [be] decided by a district judge rather than a bankruptcy judge.' "[18]

 It is well settled that CERCLA is a statute " 'rooted in the commerce clause' and is precisely 'the type of law ... Congress had in mind when it enacted the statutory withdrawal provision [in § 157(d) ].' "[19] Therefore, the determination of whether CERCLA is a "law[ ] of the United States regulating organizations or activities affecting interstate commerce" is not at issue here.[20] Moreover, it is undisputed that the Railroads timely moved this court for a withdrawal of reference pursuant to § 157(d). Thus, the only remaining question is whether approval of VPG's environmental settlement agreements requires substantial and material consideration of CERCLA or merely requires that statute's straightforward application to a particular set of facts.

 In resolving that question, the court first notes that CERCLA specifically provides for the use of settlement agree-

---

13. The court also agrees with the Railroads that the Bankruptcy Court failed to make necessary findings and conclusions to justify approval of VPG's CERCLA settlements or to require VPG to put on evidence showing that the settlements are fair, reasonable, and faithful to CERCLA objectives.

14. See AT & T v. Chateaugay Corp., 88 B.R. 581, 583 (S.D.N.Y.1988).

15. See id.

16. See In re National Gypsum Co., 134 B.R. 188, 192–93 (N.D.Tex.1991); AT & T, 88 B.R. at 584.

17. AT & T, 88 B.R. at 584 (quoting In re Johns–Manville Corp., 63 B.R. 600, 602 (S.D.N.Y.1986)).

18. Id. (quoting Johns–Manville, 63 B.R. at 602).

19. National Gypsum, 134 B.R. at 191 (quoting United States v. ILCO, 48 B.R. 1016, 1021 (N.D.Ala.1985)).

20. 28 U.S.C. § 157(d).

ments to encourage potentially responsible persons ("PRPs") " 'to contribute to clean-up costs and/or to undertake response activities themselves.' "[21] Settlement of such claims is particularly encouraged where, as here, a government actor committed to the protection of the public interest has determined that settlement of a particular claim is appropriate.[22] A district court's review of an agreement formulated under circumstances such as these should thus be broad in scope, "leaving highly technical issues and relatively petty inequities to the discourse between parties."[23] Indeed, the court should be careful not to substitute its own judgement for that of the parties entering into the agreement.[24] Rather, the court should treat each case on its own merits, recognizing the broad spectrum of potential problems and possible solutions envisioned by the settling parties.[25]

In so doing, however, " '[t]he Court must eschew any rubber stamp approval in favor of an independent evaluation, [stopping] short of the detailed and thorough investigation that it would undertake if it were actually trying the case.' "[26] Ultimately, the court must satisfy itself that the proposed agreement is fair, reasonable, and faithful to the objectives of CERCLA.[27] Applying these standards to the instant appeal, the court is convinced that the process of determining whether VPG's environmental settlement agreements with the State are fair, reasonable, and faithful to CERCLA's objectives requires the substantial and material consideration of CERCLA.

Beginning with the first of these three factors, a court's examination of a proposed agreement for fairness under CERCLA includes both procedural and substantive components.[28] While the procedural fairness inquiry ordinarily evaluates the negotiation process to appraise its candor, openness, and bargaining balance, the substantive fairness analysis focuses on the concepts of corrective justice and accountability.[29] At the core of a substantive fairness determination is the notion that each party should bear the cost of the harm for which it is legally responsible.[30] In order to achieve the requisite balance under this factor, the settlement terms must reflect a reasonable measure of comparative fault that apportions liability among the settling parties based on estimates of the relative harm caused by each party.[31] For a reviewing court to find that an agreement satisfies the substantive fairness standard, therefore, the court must evaluate the evidence before it and the provisions of CERCLA to determine each settling party's degree of liability and, ultimately, whether the settlement is fair to other PRPs against whom the same governmental agencies may have outstanding claims. Such determinations cannot be made without substantial and material consideration of CERCLA.

Turning to the reasonableness factor, when determining whether a proposed agreement is reasonable, courts review the settlement in light of several criteria. First, they evaluate the nature and extent of the hazards at the site in question and

21. *United States v. Wallace,* 893 F.Supp. 627, 631 (N.D.Tex.1995) (quoting *United States v. Cannons Eng'g Corp.,* 899 F.2d 79, 85 (1st Cir.1990)).

22. *See Cannons Eng'g,* 899 F.2d at 84.

23. *Id.* at 85–86.

24. *See Wallace,* 893 F.Supp. at 631.

25. *See Cannons Eng'g,* 899 F.2d at 86.

26. *Wallace,* 893 F.Supp. at 632 (quoting *Armstrong v. Board of Sch. Directors of Milwaukee,* 616 F.2d 305, 314–15 (7th Cir.1980)).

27. *See id.*

28. *See Cannons Eng'g,* 899 F.2d at 86.

29. *See id.*

30. *See id.* at 87.

31. *See id.*

the degree to which the remedy provided in the agreement will address those hazards.[32] Additionally, courts determine what possible alternative approaches are available for remedying the hazards at the site.[33] Next, courts review the relative strength of the parties' litigating positions while taking into account the foreseeable risk of loss.[34] Finally, a court must determine whether the settlement satisfactorily compensates the public for the actual and anticipated costs of remedial and response measures.[35] It is evident that analysis and application of these criteria to CERCLA agreements like those incorporated into VPG's Plan also involves considerable review of the statute's provisions. For instance, in measuring the relative strength of the parties' litigating positions under the reasonableness standard, a court would have to look carefully at the applicable provisions of CERCLA that give rise to the claims being asserted by the respective governmental entities. Only then can the court determine whether the agreement satisfactorily takes into account the strength of each party's litigating position and the foreseeable risk of loss attendant thereto.

 The final requirement of the three factor test essentially mandates that courts ascertain whether a proposed agreement is consistent with the goals and policy concerns of CERCLA.[36] The two predominant policies underlying CERCLA are (1) that the federal government be able to respond efficiently and promptly to harmful environmental conditions, and (2) that each party responsible for causing the harmful conditions be required to bear the cost and assume responsibility for remedying the problem.[37] While " 'the technical efficacy of the selected remedial measures is not in issue,' "[38] to be consistent with the goals of CERCLA proposed settlement agreements must properly apportion liability using a method reasonably related to assuring PRP accountability.[39] Again, such determinations require an examination into each party's potential degree of fault based on the particular provisions of CERCLA at issue.

From this, it is apparent that in each phase of a court's limited, albeit careful, review of CERCLA settlement agreements, the court must assess the potential liability of both settling and non-settling parties. The court thus concludes that the process of approving VPG's environmental settlement agreements with the State necessarily involves the substantial and material consideration of CERCLA and not merely its straightforward application to the facts of this case. That process will require the court to examine the unique facts of the case in light of those CERCLA provisions which create the causes of action at issue. Because that process requires "significant interpretation of [a] federal law[ ] that Congress would have intended to [be] decided by a district judge rather than a bankruptcy judge,"[40] the Bankruptcy Court was without jurisdiction to engage in that process when confirming VPG's Plan in this case.

The court finds support for its conclusion in *In re National Gypsum Co.*, 134 B.R. 188 (N.D.Tex.1991). In that case, the court noted that when a CERCLA claim arises in a bankruptcy proceeding, such issues as dischargeability of claims, estimation of claims, standards of liability, and priority of claims cannot be resolved by a

**32.** *See id.* at 89–90.

**33.** *See Wallace,* 893 F.Supp. at 635.

**34.** *See id.*

**35.** *See id.*

**36.** *See id.* at 636.

**37.** *See id.*

**38.** *Id.* at 636 (quoting *Cannons Eng'g,* 899 F.2d at 91).

**39.** *See id.*

**40.** *AT & T,* 88 B.R. at 584 (quoting *Johns–Manville,* 63 B.R. at 602).

bankruptcy court.[41] In this court's view, the process of deciding whether proposed settlement agreements satisfy CERCLA's approval standards in complex bankruptcy proceedings involves determinations that are analogous to those found in *National Gypsum* to be beyond the jurisdiction of a bankruptcy court. The court's conclusion is further bolstered by the fact that the policies underlying CERCLA are at odds with the ultimate objectives of the Bankruptcy Code in important respects and, thus, will require particularly close attention.[42] Finally, it is noteworthy that the Bankruptcy Court itself acknowledged during the confirmation hearings that its jurisdiction to approve the CERCLA agreements was in question and, in a Report and Recommendation dated August 14, 1998, recommended that all CERCLA related claims be withdrawn from its consideration on the ground that it "is devoid of jurisdiction over CERCLA matters." [43]

Accordingly, the court holds that the Bankruptcy Court' confirmation order and its two mandatory injunctions implementing VPG's environmental settlement agreements with the State of Texas must be vacated and that the reference of VPG's CERCLA settlement agreements with the State must be withdrawn.

### C. Applicability of The Absolute Priority Rule

The next primary issue raised by the Railroads' appeal is whether VPG's Plan violates the absolute priority rule of 11 U.S.C. § 1129(b). The Railroads argue that the Plan should not have been con-

firmed by the Bankruptcy Court because it violates § 1129(b) by paying the claims of Class 12 patronage stockholders in full while the Railroads' senior claims in Class 9 will receive at most a 19.2% recovery. According to the Railroads, patronage stock constitutes an equity interest that is junior to unsecured debt and cannot be paid under the absolute priority rule unless the claims of all senior debt holders are first paid in full. VPG counters that unlike traditional stock, patronage stock in the context of a cooperative association is more properly characterized as debt. VPG thus argues that § 1129(b) is neither implicated nor violated because Class 12 claims are not junior to the Railroads' claims. For its part, the Committee asserts that payment of patron stock, whether deemed debt or equity, does not violate the absolute priority rule in this case because the Railroads' Class 9 claims will not likely survive VPG's $4 million counterclaims. The court agrees with the Railroads and holds that VPG's Plan violates the absolute priority rule.

■■■■ Section 1129 of the Bankruptcy Code governs the confirmation of Chapter 11 reorganization plans. A proposed plan of reorganization must be confirmed if it meets all the general requirements outlined in § 1129(a). One of those requirements is that each class of impaired creditors must vote to accept the plan, in which case the plan is deemed to be consensual.[44] At least two-thirds of the creditors eligible to vote in each class must accept the plan for the class to be deemed

---

**41.** *See National Gypsum*, 134 B.R. at 192. In *National Gypsum*, Judge Sanders surveyed the reported bankruptcy cases involving consideration of CERCLA and noted that withdrawal of reference was granted pursuant to § 157(d) in every instance where a party requested withdrawal. *See id.* at 193.

**42.** As was observed in *National Gypsum*: "[T]he goal of CERCLA—cleaning up toxic waste sites promptly and holding liable those responsible for the pollution—is at odds with the premise of bankruptcy, which is to allow

debtors a fresh start by freeing them of liability." *Id.* at 192 (quoting *In re Combustion Equip. Assocs.*, 838 F.2d 35, 37 (2nd Cir. 1988)). Judge Sanders went on to explain that any exploration of the policy conflicts between CERCLA and the Bankruptcy Code would necessarily involve the consideration of both statutes. *See id.* at 193.

**43.** R. 862 at 198; *see also* R. 1214 at 8.

**44.** *See* § 1129(a)(8).

an accepting class.[45] If an impaired class of creditors votes to reject the plan, the plan becomes unconfirmable unless the bankruptcy court finds that it satisfies what is commonly known as the cramdown provision of § 1129(b). Under a cramdown analysis, a proposed plan can occur only if "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."[46] A plan may be deemed fair and equitable to a dissenting class only if it complies with the absolute priority rule.[47] Under that rule, no class of claims or interests junior to that of the dissenting class can receive or retain any property under the plan unless the dissenting class is first paid in full.[48]

In this case, less than two-thirds of the claims allowed in Class 9 for voting purposes voted to accept VPG's Plan, rendering Class 9 a rejecting class of impaired unsecured creditors. This is evidenced by VPG's own vote tally and clearly reflects the understanding of the parties and the Bankruptcy Court at the confirmation hearing on June 5, 1997.[49] VPG's Plan could thus be confirmed only by satisfying the requirements of a cramdown.[50] For reasons not made clear by the parties' briefs, the appellate record, or the confirmation order, the applicability of § 1129(b) was never addressed or resolved by the Bankruptcy Court despite having been raised on a number of occasions by the Railroads. Under such circumstances, the court would ordinarily remand the case to enable the Bankruptcy Court to apply the necessary cramdown analysis and determine whether the absolute priority rule is violated. Remand is unnecessary, however, where the record on appeal is sufficiently developed to enable the appellate court to "fully understand and resolve the issue on appeal."[51] Such is the case here.

■ As noted above, the absolute priority rule prohibits payment to a junior class of claimants when a dissenting senior class has not been paid in full. VPG's Plan allows for holders of patronage stock redemption claims in Class 12 to retain their full pre-petition interest in the Debtor even though the unsecured claims of Class 9 will receive at most a 19.2% recovery.[52] The permissibility of this arrangement depends on whether patronage stock is properly characterized as equity or debt. While the court acknowledges that this raises "an extraordinarily elusive question" given the unique nature of cooperatives,[53] the greater weight of authority favors the classification of patronage stock as equity.

To begin with, governing Texas law clearly evinces an intent to treat patronage stock as an interest that is junior to the debts of a corporation or cooperative. For example, the Texas Business Corporation Act,[54] under which VPG was

---

45. See § 1126(c) (a class of creditors accepts a plan if a majority of the creditors and those holding two-thirds of the total dollar amount of the claims within that class vote to approve the plan).

46. § 1129(b)(1).

47. See Bank of Am. Nat'l Trust & Sav. Assoc. v. 203 N. LaSalle St. Partnership, 526 U.S. 434, 441–42, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999).

48. See 11 U.S.C. § 1129(b)(2)(B); Case v. Los Angeles Lumber Products Co., Ltd., 308 U.S. 106, 122, 60 S.Ct. 1, 84 L.Ed. 110 (1939).

49. See Railroads' Brief at Tab D; R. 815 at 446–95. See also R. 863 at 34.

50. While the Committee does not contest that this is a cramdown plan, VPG takes the position that the Plan is actually consensual, apparently on the ground that the Railroads' claim may ultimately be disallowed.

51. In re Besing, 981 F.2d 1488, 1494 (5th Cir.1993).

52. See, e.g., R. 861 at Ex. 11.

53. In re Wabash Valley Power Ass'n, 72 F.3d 1305, 1316 (7th Cir.1995).

54. Tex. Bus. Corp. Act Ann. art. 6.04.

incorporated, provides for the following distribution of assets in the event of a corporation's dissolution: "After paying, satisfying, or discharging all its debts, liabilities, and obligations, ... the corporation shall then distribute the remainder of its properties and assets, either in cash or in kind, to its shareholders according to their respective rights and interests." This deliberate subordination of stock to all other debt interests is similarly reflected in the Texas Cooperative Association Act.[55] That statute provides in relevant part:

> When an association is dissolved, its assets shall be distributed in the following manner and order: (1) by paying its debts and expenses; (2) by returning to the investors the par value of their capital; (3) by returning to the subscribers to invested capital the amounts paid on their subscriptions; (4) by returning to patrons the amount of patronage dividends credited to their accounts; [and] (5) by returning to members their membership capital.[56]

These two statutes clearly suggest that whatever term most accurately describes patronage stock, Texas law deems such an interest to be subordinate to regular debt. Another example of this state law bias in favor of treating patronage stock more like equity is found in Article 2.38(B)(1) of the Texas Business Corporation Act, which precludes a corporation from redeeming stock if the distribution would force the corporation into insolvency.[57] No analogous restriction is placed on the payment of corporate debt nor would such a restriction make any sense. Neither VPG nor the Committee address the import of these state law provisions or counter the Railroads' argument that they are dispositive of the issue of whether Class 12 claims must be treated as equity.

In addition to the guidance gleaned from state law, the court finds further insight from the available case law. For example, the clear majority of courts that have addressed the issue either directly or indirectly have concluded that funds allocated to patrons of a cooperative but temporarily retained by the cooperative for use as operating capital do not constitute debt of the cooperative.[58] For example, in *In re Bonnema*, 219 B.R. 951 (Bankr.N.D.Tex. 1998), a court in this circuit was called

---

55. Tex.Rev.Civ. Stat. Ann. art. 1396–50.01.

56. *Id.* at § 38(c).

57. *See* Tex. Bus. Corp. Act Ann. art. 2.38(B)(1).

58. *See, e.g., In re Lamar Farmers Exchange,* 76 B.R. 712, 716 (Bkrtcy.W.D.MO. 1987) (holding that patronage equity credits held by an agricultural cooperative are not an indebtedness of the cooperative that is presently due and payable to its members); *In re F.L.F. Farmers Cooperative Association,* 170 F.Supp. 497, 500 (D.N.J.1958) (holding that patronage dividends do not represent debts due and owing by a cooperative association); *In re Bonnema,* 219 B.R. 951, 954 (Bankr.N.D.Tex. 1998) (holding that capital retains certificates issued to patrons of agriculture cooperative to evidence their equity interests did not constitute indebtedness of the cooperative); *In re Barr,* 180 B.R. 156, 159 (Bankr.N.D.Tex.1995) (holding that a patron's interest in its capital credits with an electric cooperative are best classified as an equity interest); *In re Greens-*

*boro Lumber,* 157 B.R. 921, 926 (Bankr. M.D.Ga.1993) (holding that "it is well established that 'equity credits allocated to a patron on the books of a cooperative do not reflect an indebtedness which is presently due and payable by the cooperative to such patron' "); *In re Wholesale Warehouse,* 141 B.R. 59, 63 (Bankr.D.N.J.1992) (holding that a patron's interest in its capital account retained by a cooperative is an equity interest); *In re Eastern Maine Electric Cooperative,* 125 B.R. 329, 339 (Bankr.D.Me.1991) (holding that allocated patronage capital that a cooperative's board of directors has not yet voted to retire remains an ownership interest in the cooperative, not an unsecured claim); *In re Beck,* 96 B.R. 161, 163 (Bankr.C.D.Ill.1988) (holding that a debtor's patronage earnings account in a farm cooperative "reflects ... an ownership interest in the co-op rather than a debt due and owing"); *In re Cosner,* 3 B.R. 445, 449 (Bankr.D.Or.1980) (holding that patronage dividends cannot be used to offset amount that a bankrupt patron owes to a cooperative because such funds constitute an equity interest rather than a debt interest).

upon to decide whether a patron of an agricultural cooperative could assign its patronage equity (capital retains) to a bank as security for a loan contrary to the cooperative's bylaws. The Chapter 7 Trustee sought to void the assignment as a violation of the bylaws whereas the bank argued that the capital retains were general intangibles under Article 9 whose transferability could not be restricted by the cooperative. After noting that "funds retained by cooperatives but allocated to patrons 'have characteristics of both shares of stock in a corporation and of corporate obligations,'" the court concluded, as had most other courts, that the funds were most like equity.[59]

In *In re Eastern Maine Electric Cooperative*, 125 B.R. 329 (Bankr.D.Me.1991), the court considered the similar question of whether patronage capital in a rural electric cooperative is more properly treated as equity or debt. That court also concluded that the right of patrons to recover their patronage capital from the cooperative was more accurately described as an equity interest than as a claim for repayment of debt.[60] The court's decision was based in part on the fact that the cooperative's bylaws did not provide patrons with a right to repayment of the patronage capital until the board of directors voted to retire those accounts. The court noted:

> It is well settled that equity credits allocated to a patron on the books of a cooperative do not reflect an indebtedness which is presently due and payable by the cooperative to such patron. Such equity credits represent patronage dividends which the board of directors of a cooperative, acting under statutory authority to do so, has elected to allocate to its patrons, not in cash or other medium of payment which would immediately take such funds out of the working capital of the cooperative, but in such manner as to provide or retain capital for the cooperative and at the same time reflect the ownership interest of the patron in such retained capital.[61]

The *Eastern Maine* court thus concluded that the patrons' interest in patronage capital that the cooperative's board of directors had not yet voted to retire constituted an ownership interest that was junior to the unsecured debt of the objecting creditor.[62]

This court finds the reasoning of *Bonnema, Eastern Maine,* and the other cases footnoted above to be persuasive on this issue. As in those cases, VPG's patrons hold stock that is not payable on demand like debt would be, but is subject to a variety of limitations and, in fact, is wholly contingent upon the cooperative's profitability.[63] When coupled with those provisions of Texas law indicating that patronage stock is subordinate to debt, the fact that most courts have treated patronage stock as equity under analogous circumstances supports its like treatment here.[64]

---

59. *Id.* at 954 (citations omitted)

60. *See id.* at 339.

61. *Id.* at 336 (quoting *Clarke County Cooperative v. Read,* 243 Miss. 879, 139 So.2d 639, 641 (1962)).

62. *See id.* at 339.

63. *See supra* n. 2.

64. VPG cites *In re Wabash Valley Power Ass'n,* 72 F.3d 1305 (7th Cir.1995), for the proposition that stock redemption claims can and should be characterized as debt. However, *Wabash* is readily distinguishable from the case at bar because it was decided under Indiana law and under corporate articles and bylaws that were different in material respects from those applicable to this case. As the Railroads note, for example, *Wabash* was based on an Indiana cooperative statute that does not subordinate stock redemption claims to the debts of the cooperative. Indeed, the Seventh Circuit acknowledged that "the characterization of patronage capital accounts in different jurisdictions does not admit of a uniform resolution: instead it is determined by state law and the relevant articles and bylaws as applied to particular cooperative organizations." *Id.* at 1317.

In reaching this conclusion, the court observes that the Bankruptcy Court itself seems to have viewed patronage stock as equity early on in the proceedings below.[65] And while certainly not dispositive, it is noteworthy that all of VPG's financial records identify patronage stock as equity and the Plan itself characterizes that stock as "equity securities." [66] All of these factors combine to persuade the court that Class 12 stock redemption claims should be treated as equity interests that are subordinate to unsecured debt. Because VPG's Plan provides for Class 12 claimants to retain the full value of their pre-petition equity despite the fact that the Railroads' senior claims are not paid in full, the Plan violates the absolute priority rule.

▆▆▆▆▆ While this defect would appear to be fatal to VPG's Plan, Courts have recognized a "new value corollary" or "new value exception" to the absolute priority rule under which a plan that otherwise violates the rule of absolute priority can yet be confirmed. Under that legal doctrine, junior claim holders are not barred from receiving or retaining property interests in a reorganized debtor over the objection of an impaired senior class of creditors if the junior claim holders make a post-petition contribution to the debtor

that (1) is new, (2) is in the form of money or money's worth, (3) is reasonably equivalent to the value of the interest retained, and (4) is necessary to the debtor's successful reorganization.[67] The new value corollary operates on the premise that when an old equity holder retains its prepetition interest in the reorganized debtor by meeting the four above-noted requirements, the debtor is not retaining that interest "on account of" its prior interest as proscribed by § 1129(b)(2)(B)(ii), but is instead participating in the reorganized debtor "on account of" a new, substantial, necessary, and fair infusion of capital.[68]

In this case, the Bankruptcy Court made no findings or conclusions about the applicability of the new value corollary. The Railroads argue that this court should nevertheless find that the new value corollary does not apply because VPG failed to demonstrate during the confirmation hearings below that Class 12 claimants have satisfied any one of the four required elements of the corollary. VPG does not directly rebut the Railroads' argument on this point but, as noted above, takes the position that § 1129(b) is not implicated by this case because the interests of Class 12 claimants are not junior to Class 9 claims.

---

**65.** On October 9, 1996, the Bankruptcy Court entered an order removing three patron stockholders from the Committee's membership. *See* R. 216. That order came in response to a motion to remove those patrons from the Committee because they were equity interest holders who represented different objectives and interests than the unsecured creditors who were on the Committee. Although the Bankruptcy Court's order did not expressly identify patronage stock as an equity interest when granting the motion, that conclusion is implicit in the court's finding that the interests of the patron stockholders were sufficiently dissimilar from those of the unsecured creditors to warrant their removal from the Committee. In an order dated December 11, 1998, this court ordered all pleadings and orders dealing with the composition of the Committee to be stricken from the Railroads' Designation of Contents for Inclusion in the Record on Appeal. Now that the court has had an opportunity to better gauge the scope of the issues on appeal, the court

orders the record supplemented to include all of those items pursuant to Rule 10(e) of the Federal Rules of Appellate Procedure. One pleading in that group that is of particular note is VPG's response in opposition to the motion to remove the patron stockholders from the Committee. In that pleading, VPG argued that while patron stockholders "may be equity interest holders," they should be permitted to remain on the Committee because they also had claims for unpaid patronage refunds that "have absolutely nothing to do with stock ownership." *See* R. 150 at ¶ 4. Thus, VPG's position on whether patronage stock is an equity interest has arguably been inconsistent in this action.

**66.** *See* R. 862 at 472; R. 768 at 36 § 6.08.

**67.** *See LaSalle,* 526 U.S. at 442–44, 119 S.Ct. 1411.

**68.** *See id.* at 442–43, 119 S.Ct. 1411.

The Committee, on the other hand, argues that to the extent that the absolute priority rule is violated at all, the new value corollary is satisfied because Class 12 claimants have provided post-petition cash to VPG by contributing a portion of their annual patronage refunds for the years 1996–98 and have agreed to postpone redemption of their stock claims for five years.

The court finds that the record is not sufficiently developed to enable resolution of this question on appeal. For example, there is insufficient evidence from which to make the necessary factual findings on whether VPG's patrons have made a bona fide post-petition contribution of money or money's worth that is legally necessary for an effective reorganization. Without enough evidence to determine whether the requisite new value contribution has been made, the court also cannot begin to determine if that contribution is reasonably equivalent to the value of the interest received or retained in return. Resolution of these potentially complex issues requires the presentation of evidence. Because the court is unable to determine from the record whether the new value corollary is applicable and, if so, whether it is satisfied, the case must be remanded to the Bankruptcy Court to receive evidence and make those determinations.[69]

### D. Application of the Best Interest of Creditors Test

■ The third central component of the Railroads' appeal challenges the Bank-

ruptcy Court's application of the best interest of creditors test found in § 1129(a)(7). The Railroads contend that the Bankruptcy Court's analysis is flawed in many ways and that neither its findings and conclusions nor the evidence of record supports the determination that the Plan meets the best interest of creditors. VPG and the Committee disagree. The court holds that the record does not support a finding that VPG's Plan is in the best interest of creditors.

One of the most fundamental prerequisites to confirmation of a proposed plan of reorganization is that it satisfy the best interest of creditors test. That test provides that if the holder of a claim impaired under a plan has not accepted the plan, such holder must "receive ... on account of such claim ... property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive ... if the debtor were liquidated under chapter 7 ... on such date." [70] In other words, "§ 1129(a)(7) requires that each holder of a claim in a class either accept the plan or receive at least as much as it would receive in a chapter 7 liquidation." [71] In this case, the Bankruptcy Court's conclusion that VPG's dissenting creditors will receive at least as much under the Plan as they would in liquidation suffers from three main weaknesses.

To begin with, the Bankruptcy Court's opinion seems to have been based, at least in part, on the application of a questionable liquidation analysis containing what the

---

**69.** If, after the parties have had an opportunity to fully brief the issues and present any necessary evidence, the Bankruptcy Court finds that the new value corollary both applies and is satisfied, it will then need to complete the cramdown analysis by turning its attention to the issue of whether the Plan discriminates unfairly in violation of § 1129(b)(1). On remand, the Bankruptcy Court will also want to carefully consider whether the Supreme Court's recent treatment of the absolute priority rule and the new value corollary in its *LaSalle* opinion has any application here. In that case, the court held that a plan violates the absolute priority rule

if it enables the debtor's old equity holders to retain their interest in the reorganized debtor without permitting any other parties to compete for that equity or to propose a competing plan. *See id.* 526 U.S. at 458, 119 S.Ct. 1411. Because this case presents arguably analogous circumstances, *LaSalle* obviously may have some bearing on the outcome here.

**70.** § 1129(a)(7).

**71.** *In re Briscoe Enterprises, Ltd.,* 994 F.2d 1160, 1167 (5th Cir.1993).

Fifth Circuit referred to as "an apparently arbitrary 30% discount factor." [72] That discount factor, which was included in VPG's liquidation analysis for the first time near the conclusion of the confirmation hearings, was strongly objected to by the Railroads and had the effect of drastically reducing VPG's already deeply discounted liquidation value. [73] With the inclusion of the new discount factor, VPG was able to show, also for the first time, that the dissenting creditors in Classes 7 and 9 would not receive more in a liquidation than they would under the Plan. While the Bankruptcy Court initially indicated that it "does not totally agree but certainly does not disagree with using such a rate," [74] it later stated that it had "doubts that a 30% discount rate in its liquidation analysis is correct." [75] Notwithstanding these expressed doubts, the court went on to conclude that it was "overwhelmingly convinced" that VPG's creditors would receive more under the Plan than in a liquidation. [76]

The problem with the Bankruptcy Court's conclusion on this point is that one cannot conclude that § 1129(a)(7) is satisfied without also concluding that VPG's dubious 30% discount factor should apply. This is evident from the fact that VPG's own expert conceded during the confirmation hearings that without applying the additional discount factor, dissenting creditors would receive a higher recovery in a liquidation than under the Plan. [77] In fact, the Railroads contend without dispute from VPG or the Committee, that every liquidation analysis prepared by VPG in connection with the confirmation hearings showed a higher recovery for creditors in Classes 7 and 9 under a liquidation scenario until VPG added its 30% discount factor to the equation. [78] Thus, it was clearly erroneous for the Bankruptcy Court to conclude that dissenting creditors would receive at least as much under the Plan as in liquidation without first resolving whether VPG's proposed discount factor was even valid. [79] A plan obviously cannot be confirmed if there is an insufficient evidentiary basis to determine that it is in the best interest of creditors. [80] Because that determination must be based on evidence before the court, the case must be remanded to enable the parties to present evidence on projected liquidation recoveries and the validity of VPG's proposed discount factor. [81] Before this or any similar plan of reorganization can be confirmed, the Bankruptcy Court will have to erase any doubts it might have about the propriety of employing a discount factor as part of its liquidation analysis.

**72.** *In re Voluntary Purchasing*, 98–40793 at *4, 196 F.3d 1258 (5th Cir. Sept.20, 1999) (unpublished).

**73.** *See, e.g.*, R. 862 at 115–16.

**74.** *VPG*, 222 B.R. at 112.

**75.** *Id.* at 113.

**76.** *Id.*

**77.** *See* R. 862 at 625.

**78.** *See* Railroads's Brief at 38.

**79.** Even if it were possible for the Bankruptcy Court to conclude that the Plan satisfies the best interest of creditors test without the use of VPG's 30% discount factor, it is insufficient for the court to simply state that bare conclusion without record evidence to support it.

*See Chandler v. City of Dallas*, 958 F.2d 85, 89 (5th Cir.1992). A judgment about whether § 1129(a)(7) is met must be based on evidence, not assumptions. *See In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 297 (Bankr.S.D.N.Y.1990). Indeed, there must be evidence in the record establishing by a preponderance of the evidence that VPG's creditors will not receive less under the Plan than in liquidation. *See Briscoe*, 994 F.2d at 1165. Because such evidence is lacking here, the Bankruptcy Court's opinion cannot stand.

**80.** *See In re MCorp Financial, Inc.*, 137 B.R. 219, 228 (Bkrtcy.S.D.Tex.–Houston 1992).

**81.** In light of this conclusion, the court need not reach the Railroads' claim that the Bankruptcy Court abused its discretion by permitting VPG to call expert witnesses who were not qualified or properly disclosed and whose testimony exceeded the scope of the parties' prior stipulation.

■ In addition to relying on a potentially defective discount factor, the Bankruptcy Court's opinion also fails to confront the issue of the Plan's effective date and its impact on the best interest of creditors test. Section 1129(a)(7) requires a court to determine whether each dissenting claim holder will receive at least as much under a plan as it would in a Chapter 7 liquidation *as of the effective date of the plan.*[82] Thus, only by determining when a plan's effective date occurs can a court engage in a meaningful analysis of the best interest test. Here, the Bankruptcy Court's confirmation order purports to determine whether the Railroads and other dissenting creditors will recover more in liquidation than under VPG's Plan but does not first determine the effective date from which such financial determinations must be measured. Because such matters as asset valuation and the estimation of liquidation recoveries can be drastically affected by the timing of one's calculations, a court must ensure that all financial projections incorporated into its analysis reflect the resources that are likely to be available to a debtor on a plan's effective date. The Bankruptcy Court failed to do that and its best interest analysis is thus incomplete.[83]

■ Finally, the court finds that the Bankruptcy Court's application of the best interest test is called into question by the fact that certain improper "policy considerations" were factored into the court's analysis. For instance, the Bankruptcy Court found it relevant and gave some weight to the fact that the Railroads have vigorously opposed VPG's reorganization at every step of the confirmation process and that the Plan is supported by every major creditor constituency except the Railroads.[84] Additionally, it appears that the Bankruptcy Court's analysis was significantly influenced by VPG's unique status as a cooperative although there is no indication that such status merits a different application of the best interest of creditors test. As the Fifth Circuit noted in its opinion reversing this court's denial of a stay, such considerations clearly "have no place in the application of the statute." [85]

For each of these reasons, the court holds that the Bankruptcy Court's conclusion that the Plan satisfies the best interest of creditors test was clearly erroneous and must be reversed.

### E. Summary

To summarize the court's holding, the court first finds that because the Bankruptcy Court lacked jurisdiction to approve VPG's CERCLA settlements with the State, its confirmation order and two mandatory injunction orders must be vacated and the reference withdrawn on those matters. Additionally, the court finds that patronage stock is an equity interest that is junior to an unsecured claim and that VPG's Plan thus violates the absolute priority rule by permitting Class 12 claimants to retain the full value of their pre-petition equity while senior claims in Class 9 receive less than full recovery. Because the record is not adequately developed to enable a determination of whether the new value corollary to the absolute priority rule applies in this case, however, the case

82. *See* § 1129(a)(7).

83. Depending on the Bankruptcy Court's resolution of the remaining § 1129(b)(2)(B)(ii) issue on remand, it may be unnecessary to revisit the question of the Plan's effective date. In the event that the Bankruptcy Court determines that VPG's Plan survives all remaining conditions of the cramdown analysis, however, the court will have to resolve the effective date issue as part of its analysis under § 1129(a)(7). It is apparent from its

September 30, 1999, Order that the Fifth Circuit intended that any such resolution of the effective date issue be made independent of Judge Sanders' previous adjudication of that matter.

84. See *VPG*, 222 B.R. at 113–14.

85. *In re Voluntary Purchasing Groups, Inc.*, No. 98–40793 at *4, 196 F.3d 1258 (5th Cir. Sept.20, 1999) (unpublished).

must be remanded for resolution of that matter by the Bankruptcy Court. Finally, the court finds that the Bankruptcy Court erred in finding that the best interest of creditors test was satisfied without resolving outstanding issues about the application of VPG's proposed 30% discount factor and the Plan's effective date, and by basing its conclusion in part on improper policy considerations.

In reaching these conclusions the court does not turn a blind eye toward the already long pendency of this hotly contested case and the acrimony that apparently exists among some of the parties. Indeed, the court is reticent about the possibility of sending the parties back to the drawing board to begin the whole confirmation process anew. Nevertheless, the challenging conditions in which this case finds itself certainly do not justify noncompliance with the Bankruptcy Code. As the Fifth Circuit noted in its recent order, "the public interest weighs heavily in favor of a confirmation process that is seen specifically to follow and comport with applicable statutory standards."[86] To that end, the case must be remanded for further proceedings consistent with this opinion.

### III. CONCLUSION

For the reasons given and on the authorities cited, the Bankruptcy Court's order of confirmation is REVERSED and this case is REMANDED. It is so ORDERED.